# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

WILLIAM PARKER GAREY, et al.,   )
                             )
              Plaintiffs,     )
                             )
              v.            )      1:16cv542
                             )
JAMES S. FARRIN, P.C., et al.,   )
                             )
              Defendants.     )

## MEMORANDUM OPINION AND ORDER

This case comes before the Court on the "Fox Defendants' Motion to Compel Against Plaintiffs" (Docket Entry 170) (the "Motion").[1] For the reasons that follow, the Court will grant in part and deny in part the Motion.

## BACKGROUND

Alleging violations of the Driver's Privacy Protection Act of 1994, 18 U.S.C. § 2721 et seq. (the "DPPA"), James Garey ("J. Garey"), William Garey ("W. Garey"), and Aaron Cruthis (collectively, the "Original Plaintiffs") initiated a purported class action against a lawyer and various law firms. (See Docket Entry 1 (the "Complaint") at 1-4.) Shortly thereafter, Original

---

1 For purposes of the Motion, "James S. Farrin, P.C., d/b/a Law Offices of James Scott Farrin, Marcari, Russotto, Spencer & Balaban, P.C., Riddle & Brantley, L.L.P, Wallace Pierce Law, PLLC, Van Laningham & Associates, PLLC d/b/a Bradley Law Group, Lanier Law Group, P.A., Crumley Roberts, LLP, and Hardee & Hardee LLP" comprise the "Fox Defendants." (Id. at 1 n.1) [Citations herein to Docket Entry pages utilize the CM/ECF footer's pagination. Also, for legibility reasons, this Opinion omits all-cap font in all citations from the parties' materials.]

Plaintiffs filed an amended complaint, which (1) added Amanda
Reilly, Adilah McNeil, Charlotte Clevenger ("C. Clevenger"), Andrew
Clevenger ("A. Clevenger"), and Justin Brent Blakeslee
(collectively with Original Plaintiffs, the "Plaintiffs") as
plaintiffs and (2) added various lawyers and law firms as
defendants.  (See Docket Entry 32 (the "Amended Complaint") at 1-
10.)   The Amended Complaint alleges that "[e]ach [d]efendant
knowingly obtained, disclosed and used one or more Plaintiff's
protected personal information from a motor vehicle record for the
purpose of marketing that [d]efendant's legal services" (id.,
¶ 141) without "Plaintiffs' express consent as required by the
DPPA" (id., ¶ 142).[2]   The Amended Complaint seeks injunctive
relief, attorney's fees, and $2,500 in liquidated damages per
Plaintiff "for each instance in which a [d]efendant knowingly
obtained or used that Plaintiff's protected personal information"
(id. at 36).  (See id. at 35-36.)

The defendants moved to dismiss the Amended Complaint.  As
relevant here, Fox Defendants' dismissal motion asserted that
"Plaintiffs' theory would unconstitutionally restrict [Fox]
Defendants' Protected 'Commercial Speech' Interests."  (Docket

---

    2  According to the Amended Complaint, "Plaintiffs . . . are
individuals whose protected personal information was improperly
obtained and used by one or more of the [d]efendants in violation
of the DPPA when [d]efendants (a) obtained protected DMV
information copied from their license or registration data onto
accident reports [(each, a 'DMV-349')] and (b) used that
information to send marketing letters."  (Id. at 2.)

Entry 60 at 2.)   In support of this contention, Fox Defendants maintained that Plaintiffs' theory "violates well-established commercial speech precedent."   (Docket Entry 61 at 35.)   More specifically, Fox Defendants argued that Plaintiffs' claim fails "th[e] intermediate-scrutiny test," under which "any prohibitions on . . . protected commercial speech must 'directly advance a substantial governmental interest and [be] appropriately tailored to that purpose.'"   (Id. (second set of brackets in original) (quoting Shapero v. Kentucky Bar Ass'n, 486 U.S. 466, 485 (1988) (citing Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y., 447 U.S. 557, 566 (1980))).)

The Court (per United States District Judge Loretta C. Biggs) denied the defendants' various dismissal motions.   (See generally Docket Entry 93 (the "Dismissal Opinion").)   In so doing, the Court rejected the defendants' arguments that Plaintiffs' interpretation of the DPPA constitutes "a content-based prohibition on commercial speech [that] fails to survive intermediate scrutiny."   (Id. at 22.)   Fox Defendants subsequently sought reconsideration of the Dismissal Opinion, contending, inter alia, that it "misconstrued Central Hudson" (Docket Entry 111 at 4), which "set[s] forth a four-step 'intermediate scrutiny' test to determine whether a regulation of commercial speech is consistent with the First Amendment" (id. at 3).   Asserting that the Dismissal Opinion erred at step one of the Central Hudson test, Fox Defendants urged the

Court to "continue[] with the *Central Hudson* analysis" and complete "steps two through four of the *Central Hudson* test."  (Id. at 4.)

As requested, the Court reassessed its Central Hudson analysis.  (Docket Entry 142 (the "Reconsideration Opinion") at 6-9.)  The Reconsideration Opinion explains that, "[i]n *Central Hudson*, the Supreme Court articulated [a] four-part intermediate scrutiny test to determine the constitutionality of restrictions on commercial speech."  (Id. at 8.)  Under Central Hudson,

> (1) to receive any First Amendment protection, commercial speech "must concern lawful activity and not be misleading";
>
> (2) the asserted government interest must be "substantial" to justify the restriction;
>
> (3) the restriction must "directly advance[] the governmental interest asserted;" and
>
> (4) the restriction must not be "more extensive than is necessary to serve that interest."

(Id. (brackets in original) (quoting Central Hudson, 447 U.S. at 566).)  Although "[t]he parties d[id] not appear to contest the first *Central Hudson* factor," the Court could not, "[i]n the absence of a developed record, . . . determine whether, as applied to [Fox] Defendants' alleged conduct, the DPPA satisfies the remaining *Central Hudson* factors."  (Id. at 9.)  As such, the Court concluded that "Plaintiffs' claim [wa]s . . . not subject to dismissal, at th[at] time, on First Amendment grounds."  (Id.)

In addition to seeking reconsideration of the Dismissal Opinion, Fox Defendants filed an Answer to the Amended Complaint.

4

(See Docket Entry 97.) As relevant to the Motion, the Answer asserts the following defenses:

## Second Defense

Plaintiffs and the putative class lack standing to bring the claim alleged. This defense is based on several independent grounds, including but not limited to, that the Plaintiffs did not suffer a cognizable injury-in-fact; that Plaintiffs did not suffer an injury that has been made actionable by Congress; that Plaintiffs' alleged injuries are not fairly traceable to the conduct of [Fox] Defendants because any alleged personal information had already been made public by the [law enforcement agencies (the "LEAs")]; and that Plaintiffs' injuries are not redressable by this Court because any alleged personal information had already been made public by the LEAs.

## Third Defense

The claims of Plaintiffs and the putative class are barred because imposing liability on [Fox] Defendants violates the First Amendment of the United States Constitution. This defense is based on several independent grounds, including but not limited to, that the DPPA should not be construed so as to create a constitutional question; that interpreting the DPPA to impose liability on [Fox] Defendants would not directly advance a substantial government interest; that [Fox] Defendants engaged in protected speech; and that [Fox] Defendants cannot be held liable for allegedly obtaining, using, and disclosing information that had already been made publicly available by the LEAs.

* * * * * *

## Fifth Defense

The claims of Plaintiffs and the putative class are barred because there can be no liability for obtaining, using, or disclosing information contained in public records.

**Sixth Defense**

The claims of Plaintiffs and the putative class are barred because [Fox] Defendants cannot be held liable for the obtaining, use, or disclosure of information previously publicly disclosed by a third party.

(Id. at 27-29 (emphasis in original).)

Thereafter, Fox Defendants filed a "Joint Notice of Constitutional Challenge to Federal Statute" (Docket Entry 146) (the "Notice"), which states that certain of their defenses "raise the question of whether the DPPA violates the First Amendment" (id. at 1). In particular, the Notice maintains that the "[d]efendants' filings question whether the DPPA may discriminate between categories of private citizens, permitting the speech of some but not the speech of others." (Id.) It further contends that the "filings also question whether the DPPA should be interpreted to prevent them from obtaining, using, and disclosing information that has previously been made public by the government." (Id. at 1-2.)

After the Reconsideration Opinion issued, the Court (per the undersigned United States Magistrate Judge) entered a Scheduling Order for this matter. (See Text Order dated Jan. 28, 2019.) The Scheduling Order imposed a discovery deadline of April 30, 2020. (See Docket Entry 151 at 2.) It also established a deadline for filing a motion for class certification of August 31, 2019 (see id. at 3), which deadline, at the parties' request, the Court in July 2019 enlarged to October 30, 2019 (see Text Order dated July 6, 2019). Later that month, Fox Defendants filed the Motion, seeking

to compel responses to multiple interrogatories (each, an "Interrogatory"), requests for production of documents (each, a "Document Request"), and requests for admission (each, an "Admission Request"). (See Docket Entries 170, 171.) In response, Plaintiffs revised certain of their discovery responses but opposed the Motion as to the remaining discovery requests.

Plaintiffs subsequently moved to amend their Amended Complaint, explaining that "[t]he Second Amended Complaint would streamline the action in a number of ways." (Docket Entry 176 (the "Amendment Motion") at 3.) For instance, Plaintiffs maintained that the amendment would narrow the scope of the action by dropping two Plaintiffs with unique claims and adding two Plaintiffs with claims "similar to the remaining Plaintiffs." (Id.) Plaintiffs also proposed to narrow the putative class from individuals "listed on a DMV-349 completed by any law enforcement officer in North Carolina," to individuals "listed on DMV-349 crash reports completed by a select group of [LEAs]." (Id.) Finally, Plaintiffs explained that,

> [w]hereas the action [previously sought] liquidated damages as a result of Defendants' obtaining, disclosure, and use of Plaintiffs' personal information, the Second Amended Complaint seeks liquidated damages only for the [d]efendants' *obtaining* of Plaintiffs' personal information — a change which sidesteps any First Amendment defense since "the DPPA's limitation on *obtaining* personal information is not a restriction on speech at all . . . ." *Dahlstrom v. Sun-Times Media, LLC*, 777 F.3d 937, 949 (7th Cir. 2015) (emphasis added).

(Docket Entry 176 at 3 (emphasis and ellipsis in original).)  After
the defendants consented to the Amendment Motion (see Docket
Entries 178, 179), and the Court granted Plaintiffs' amendment
request (see Text Order dated Oct. 22, 2019), Plaintiffs filed a
"Second Amended and Supplemental Complaint" (Docket Entry 180) (the
"Second Amended Complaint").

Although the Amendment Motion envisioned limiting Plaintiffs'
claim to obtaining Plaintiffs' personal information (see Docket
Entry 176 at 3), the Second Amended Complaint does not adopt such
a limited scope.  Rather, it challenges the defendants' obtaining
and using Plaintiffs' information.  For instance, in its "Summary
of the Action" (Docket Entry 180 at 2 (emphasis omitted)), the
Second Amended Complaint alleges:

> [The d]efendants in this case are lawyers and law
> firms that have systematically violated the DPPA by
> knowingly obtaining protected personal information from
> motor vehicle records, including drivers' licenses and
> vehicle registration cards, and then using that protected
> information for hundreds, or possibly thousands, of
> people in an effort to sell their legal services.  This
> systematic abuse has continued even after the United
> States Supreme Court held, in 2013, that attorney
> solicitation is an improper use of DMV information.
>
> Plaintiffs in this case are individuals whose
> protected personal information was improperly obtained
> and used by one or more of the [d]efendants in violation
> of the DPPA when [the d]efendants (a) obtained protected
> DMV information copied from their license or registration
> data onto accident reports and (b) used that information
> to send marketing letters.  Plaintiffs file this case for
> themselves, and for others whose privacy was violated, to
> do two things:  (1) ask the Court for an injunction to
> stop [the d]efendants from further abuse of personal DMV

information; and, (2) to ask the Court to award damages
as provided by Congress.

(Id. at 2-3 (emphasis added) (citation and footnote omitted).)  The
Second Amended Complaint further asserts that specific defendants
used specific Plaintiffs' protected information for "addressing
marketing materials . . . and mailing said materials."   (Id.,
¶¶ 66-71.)  It also argues that classwide "final injunctive relief
or corresponding declaratory relief is appropriate" because "each
[d]efendant has obtained and used the names and addresses of the
members of their respective Subclasses, from motor vehicle records
for marketing purposes" and "[e]ach [d]efendant either continues to
so obtain and use names and addresses of persons involved in
accidents or could resume obtaining and using such information at
any time."  (Id., ¶ 145.)

       More specifically, according to the Second Amended Complaint:

       120. Upon information and belief, at all relevant times
       [the d]efendants have knowingly obtained and reviewed
       information from DMV-349 reports that are obtained in
       bulk with the intent to determine the names and addresses
       of those who are not at fault for each accident; then,
       using those names and addresses, [the d]efendants only
       send marketing materials to those persons who do not
       appear to be at fault.

       121. The mailings described above sent by [the
       d]efendants are form mailings.  The mailing sent by each
       [d]efendant to a Plaintiff is identical in all material
       respects to the mailings that each [d]efendant regularly
       sends to persons whose personal information, including
       name and address, has been knowingly obtained from
       DMV-349 reports.

       122. Upon information and belief, [the d]efendants sent,
       and in some cases continue to send, materials marked

"This is an advertisement for legal services" only to persons whose names and addresses [the d]efendants knowingly obtained and gleaned from DMV-349 reports.

123. Plaintiffs did not consent to allow any [d]efendant to obtain their personal information from a motor vehicle record.

124. [The d]efendants regularly and knowingly have obtained, disclosed, and used (and some of them continue to knowingly obtain, disclose, and use) protected personal information, from motor vehicle records, to market their legal services to accident victims in the same manner that [the d]efendants knowingly obtained, disclosed, and used the protected personal information of Plaintiffs.

125. In sending the above-described mailings, [the d]efendants disclosed [Plaintiffs'] names and addresses in connection with the fact that [Plaintiffs] might need legal services. Said disclosures were made, at a minimum, to employees of the postal or delivery service that delivered each mailing, as well as to [the d]efendants' office staff or contractors who participate in addressing and sending the mailings.

126. As a proximate result of [the d]efendants' unlawful conduct as described above, each [Plaintiff] sustained actual damages in having their personal information from a motor vehicle record obtained by [the d]efendants for use for marketing purposes, in having to retrieve the mailings addressed to them from a delivery person, from his or her entryway or mail receptacle or by having his or her privacy invaded by disclosure of his or her name or address in connection with a potential need for legal services.

\*\*\*\*\*\*

148. As specifically alleged above, [the d]efendants knowingly obtained the DPPA-protected personal information, including the name and address, of one or more Plaintiffs, from a motor vehicle record, and then used that personal information as described above.

149. Each [d]efendant knowingly obtained, disclosed, and used one or more Plaintiff's protected personal

information, from a motor vehicle record, for the purpose of marketing that [d]efendant's legal services.

150. When each [d]efendant knowingly obtained, disclosed, and used one or more Plaintiff's protected personal information, said [d]efendant lacked Plaintiffs' express consent as required by the DPPA.

151. When each [d]efendant identified a Plaintiff as an accident victim, used a Plaintiff's name and address to create a mailing envelope and letter, and then sent his, her, or its above-described mailing containing the words "This is an advertisement for legal services" to one or more Plaintiffs, [the d]efendants knowingly used and disclosed said Plaintiff's personal information from a motor vehicle record.

152. [The d]efendants knowingly obtained, disclosed, and used Plaintiffs' personal information from a motor vehicle record for the purpose of marketing legal services.

153. Advertising for legal services for the solicitation of new potential clients is not a permissible purpose for obtaining motor vehicle records under the DPPA. *Maracich v. Spears*, [570 U.S. 48] (2013).

154. [The d]efendants knowingly obtained, disclosed, and used Plaintiffs' personal information, from a motor vehicle record, for a purpose not permitted under the DPPA, in violation of the DPPA.

155. Because some [d]efendants continue to regularly and knowingly obtain, disclose, and use personal information, from motor vehicle records, for purposes of marketing their services, violations of the DPPA are likely to continue.

156. Under 18 U.S.C. § 2724(b)(4), the Court should enter a permanent injunction prohibiting [the d]efendants from obtaining personal information from motor vehicle records for marketing purposes. Specifically, the Court should enjoin [the d]efendants from obtaining names and addresses sourced from DMV-349s for purposes of marketing legal services; [sic]

157. Plaintiffs sustained actual damages as described above as a proximate result of [the d]efendants' unlawful conduct.

158. Because [the d]efendants knowingly obtained Plaintiffs' personal information, from a motor vehicle record, for a purpose not permitted under the DPPA, each Plaintiff is entitled to liquidated damages of $2,500.00 in lieu of actual damages for each instance in which a [d]efendant knowingly obtained, or caused to be obtained, that Plaintiff's personal information, from a motor vehicle for a purpose not permitted by the DPPA.

(Docket Entry 180, ¶¶ 120-26, 148-58.)[3]

Rather than answering the Second Amended Complaint, Fox Defendants moved to dismiss. (<u>See</u> Docket Entries 188, 189.) As relevant here, Fox Defendants base their dismissal request on the notion that Plaintiffs lack standing and "failed to plead actual damages in conformity with Rule 9" of the Federal Rules of Civil Procedure (the "Rules"). (Docket Entry 188 (the "Second Dismissal Motion") at 1-2.) More specifically, Fox Defendants' Second Dismissal Motion rests on the theory that "Plaintiffs' sole legal claim is that [the d]efendants violated the DPPA merely by obtaining public accident reports that identify them — from police department counters and law-enforcement-maintained public websites." (Docket Entry 189 at 1; <u>see also</u> <u>id.</u> (asserting that "[t]he Second Amended Complaint abandons . . . [Plaintiffs'] legal

_____

3    Plaintiffs subsequently filed a motion for class certification that similarly emphasizes the allegedly improper obtainment of information (<u>see generally</u> Docket Entries 184, 185), but also references the defendants' alleged improper use of protected information (<u>see, e.g.,</u> Docket Entry 185 at 2, 10).

claims that the [d]efendants violated the DPPA by using or disclosing their identifying information").) According to Fox Defendants, "th[is] change in theory is fatal to Plaintiffs' tenuous grasp on Article III standing" because "Plaintiffs' reconfigured claim now hinges upon whether they suffered an injury traceable to the moment Defendants got their names and addresses at the front counter of the police station or from a law-enforcement-maintained public website." (Id. at 2.) The Second Dismissal Motion focuses solely on Fox Defendants' standing and damages arguments, without raising any first-amendment issues. (See id. at 11 n.3 ("Fox Defendants do not believe that Plaintiffs' change to an 'obtainment' theory . . . 'sidesteps' relevant First Amendment defenses, or impacts the rights of members of the public . . . to receive, review and speak about information the government releases. [This] issue is not reached by [Fox] Defendants' current motion . . . .").) However, the Second Dismissal Motion expresses Fox Defendants' "inten[t] to fully brief and argue their First Amendment defenses if Plaintiffs' claim survives th[e] motion to dismiss." (Id.)

## DISCUSSION

### I. Relevant Standards

### A. Discovery Standards

"The purpose of discovery is to provide a mechanism for making relevant information available to the litigants." Fed. R. Civ. P.

26 advisory committee's notes, 1983 Amendment. Thus, parties generally "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ." Fed. R. Civ. P. 26(b)(1). "The parties and the court have a collective responsibility to consider the proportionality of all discovery and consider it in resolving discovery disputes." Fed. R. Civ. P. 26 advisory committee's notes, 2015 Amendment; see also id. (explaining that Rule 26 imposes an "obligation o[n] the parties to consider the[ proportionality] factors in making discovery requests, responses, or objections"). In turn, relevancy "essentially involves a determination of how substantively the information requested bears on the issues to be tried." Mills v. East Gulf Coal Preparation Co., LLC, 259 F.R.D. 118, 131 (S.D.W. Va. 2009) (internal quotation marks omitted); see also Cook v. Howard, 484 F. App'x 805, 812 (4th Cir. 2012) ("Relevance is thus the foundation for any request for production, regardless of the individual to whom a request is made."). "On relevancy matters, the trial court has broad discretion." Watson v. Lowcountry Red Cross, 974 F.2d 482, 489 (4th Cir. 1992).

Importantly,"[t]he civil discovery process is to be engaged in cooperatively." Mills, 259 F.R.D. at 130; see also Wagner v. St. Paul Fire & Marine Ins. Co., 238 F.R.D. 418, 422 (N.D.W. Va. 2006) (observing that "[g]amesmanship" in discovery "is not allowed");

M.D.N.C. LR 26.1(b)(1) ("The Court expects counsel to conduct discovery in good faith and to cooperate and be courteous with each other in all phases of the discovery process."). Accordingly, parties must respond with specificity to discovery requests, including by making particularized objections. Hall v. Sullivan, 231 F.R.D. 468, 474 (D. Md. 2005). Thus, general or "boilerplate" objections to discovery requests lack validity. See Kinetic Concepts, Inc. v. ConvaTec Inc., 268 F.R.D. 226, 241 (M.D.N.C. 2010) (collecting cases). Moreover, the party opposing discovery generally bears the burden on a motion to compel. Id. at 243-44 (collecting cases).

Nevertheless, "the simple fact that requested information is discoverable . . . does not mean that discovery must be had. On its own initiative or in response to a motion for protective order under Rule 26(c), a district court may limit [discovery] . . . ." Nicholas v. Wyndham Int'l, Inc., 373 F.3d 537, 543 (4th Cir. 2004). Indeed, "[d]istrict courts enjoy nearly unfettered discretion to control the timing and scope of discovery." Hinkle v. City of Clarksburg, 81 F.3d 416, 426 (4th Cir. 1996); accord Cook, 484 F. App'x at 812 (observing that "[d]istrict courts are afforded broad discretion with respect to discovery").

**B. DPPA Standards**

The DPPA arose from Congress's "[c]oncern[] that personal information collected by States in the licensing of motor vehicle

drivers was being released — even sold — with resulting loss of privacy for many persons." Maracich, 570 U.S. at 51–52. Accordingly, the DPPA prohibits "the disclosure of personal information contained in the records of state motor vehicle departments (DMVs) . . . . unless for a purpose permitted by an exception listed in 1 of 14 statutory subsections." Id. at 52. As relevant to the Motion, these exemptions include:

> (6) For use by any insurer or insurance support organization, or by a self-insured entity, or its agents, employees, or contractors, in connection with claims investigation activities, antifraud activities, rating or underwriting.
>
> (7) For use in providing notice to the owners of towed or impounded vehicles.
>
> ******
>
> (12) For bulk distribution for surveys, marketing or solicitations if the State has obtained the express consent of the person to whom such personal information pertains.

18 U.S.C. § 2721(b).[4]

"A person is liable under the DPPA if he 'knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted' by one of the statutory

---

4    The DPPA contains additional consent-based exemptions, including "[f]or any other use in response to requests for individual motor vehicle records if the State has obtained the express consent of the person to whom such personal information pertains," 18 U.S.C. § 2721(b)(11), and "[f]or use by any requester, if the requester demonstrates it has obtained the written consent of the individual to whom the information pertains," 18 U.S.C. § 2721(b)(13).

exceptions." <u>Maracich</u>, 570 U.S. at 71 (quoting 18 U.S.C. § 2724(a)). Moreover, "[e]ach distinct disclosure or use of personal information acquired from a state DMV must be permitted by the DPPA." <u>Id.</u> at 74; <u>see also</u> <u>id.</u> ("If the statute were to operate otherwise, obtaining personal information for one permissible use would entitle attorneys to use that same information at a later date for any other purpose."). Further, under the DPPA, "[d]irect marketing and solicitation present a particular concern not only because these activities are of the ordinary commercial sort but also because contacting an individual is an affront to privacy even beyond the fact that a large number of persons have access to the personal information." <u>Id.</u> at 67. After all, as the United States Supreme Court has explained, "state residents have no real choice but to disclose their personal information to the state DMV . . . . The use of that information by private actors to send direct commercial solicitations without the license holder's consent is a substantial intrusion on the individual privacy the [DPPA] protects." <u>Id.</u> at 71.

## **II. Analysis**

### **A. Initial Matters**

The Motion seeks to compel responses to multiple Admission Requests, Interrogatories, and Document Requests. (<u>See, e.g.,</u> Docket Entry 171 at 9 n.3.) After Fox Defendants filed the Motion, Plaintiffs served additional discovery responses (<u>see, e.g.,</u> Docket

Entry 173-2) and Fox Defendants and Plaintiffs resolved certain outstanding discovery issues (see Docket Entry 173-1 at 19). Accordingly, "the matters which remain for resolution by the Court are[ I]nterrogatories 7-20 and 30[] and [Document Requests 4[5]]-8" (Docket Entry 173 at 2 (emphasis omitted); see also Docket Entry 175 at 2 (detailing evolution of discovery disputes)).[6] (See generally Docket Entries 173, 175 (discussing relevant outstanding requests).)

For many of the disputed Interrogatories, Plaintiffs raised similar relevance and/or burden objections:

> Objection. Irrelevant to any party's claim or defense. For the same reasons stated in the relevance objection to No. 5 above, whether Plaintiff claims that the [LEA] acted contrary to law is irrelevant and outside the scope of discovery. The legal basis and argument for the relevance objection to No. 5 is hereby incorporated by reference as if fully stated in response to this discovery request.

---

5 Plaintiffs' memorandum initially identifies the outstanding Document Requests as "3-8" (Docket Entry 173 at 2 (emphasis omitted)), but makes no further reference to Document Request 3 (see id. at 2-23). Fox Defendants' reply memorandum likewise contains no mention of Document Request 3. (See generally Docket Entry 175.) Moreover, the record before the Court reflects that Plaintiffs provided supplemental responses to Document Request 3 after Fox Defendants filed the Motion. (See Docket Entry 173-2 at 17-31.) As such, it appears that the parties resolved their dispute regarding Document Request 3 and that Plaintiffs' reference to this request constitutes a typographical error.

6 As "some minor variations in the numbering among the sets of discovery served on the named Plaintiffs" exists, Fox Defendants and Plaintiffs identify particular discovery requests according to "the numbering in the set of requests served on Plaintiff W[.] Garey." (Docket Entry 171 at 3 n.2; see also Docket Entry 173 at 6.) This Opinion does the same.

> Furthermore, the requirement to "describe in detail"
> whether Plaintiff claims that the [LEA] acted contrary to
> law is facially burdensome in connection with this
> request. "A discovery request can be overly broad or
> unduly burdensome on its face, in which case the
> proponent of discovery bears the burden of establishing
> its relevance." *Harford Mut. Ins. Companies v. Agean,*
> *Inc.*, No. 1:09CV461, 2011 WL 2295036, at *7 (M.D.N.C.
> June 8, 2011) (citing *Hilt v. SFC Inc.*, 170 F.R.D. 182,
> 186 (D.Kan.1997 [sic])).

(Docket Entry 171-1 at 11 (emphasis omitted); see also id. at 12-

17.) Among other challenges, Plaintiffs raised similar relevance

objections to the disputed Document Requests:

> Objection. Irrelevant. For the same reasons stated in
> the relevance objection to No. 2 above, political mail
> received by Plaintiff is irrelevant and outside the scope
> of discovery. The legal basis and argument for the
> relevance objection to No. 2 is hereby incorporated by
> reference as if fully stated in response to this
> discovery request.

(Id. at 35 (emphasis omitted); see id. at 34-36.)

Fox Defendants do not address Plaintiffs' burden objection to

their request to "describe in detail" various matters. (See Docket

Entries 171, 175.) However, Fox Defendants argue that Plaintiffs'

relevance objections constitute improper general, boilerplate

objections that "do not explain why the discovery requests fail to

seek relevant information" (Docket Entry 171 at 5). (See id. at 5-

6.) As such, Fox Defendants maintain, Plaintiffs' relevance

"objections should be stricken" (id. at 5) and Plaintiffs should be

deemed to have "waived their opportunity to make any proper

objections" (id. at 6). Fox Defendants' contentions lack merit.

In their answer to Interrogatory 5 and Document Request 2, Plaintiffs detail their perspective regarding the discovery requests' failure to meet the "[m]inimal relevance threshold of Rule 26(b)(1)," as well as their lack of "bearing on liability" or "liquidated damages" or "any legitimate affirmative defense." (Docket Entry 171-1 at 8-10, 31-33 (emphasis omitted).) These responses explain the "three distinct elements giving rise to liability" under the DPPA,[7] as well as the "statutory liquidated damages" that Plaintiffs seek, and assert that the discovery requests "ha[ve] no bearing" on those items. (Id. at 9-10, 32-33.) Thus, although not explicitly updated for each discovery request, Plaintiffs' responses provide sufficient information to understand the grounds for their relevance objection as to each disputed request. Under the circumstances, the Court declines to strike Plaintiffs' relevance objections.

Finally, in their memorandum in support of the Motion and in their earlier communications with Plaintiffs regarding discovery, Fox Defendants maintained that the disputed requests sought information "likely to lead to relevant information." (Docket Entry 171 at 16 (discussing Interrogatories 7-11); see also Docket Entry 173-1 at 6 ("[W]e believe the discovery could lead to

---

7 Namely, "[t]hat a defendant (1) knowingly obtained, disclosed or used personal information, (2) from a motor vehicle record, (3) for a purpose not permitted." (Id. at 9 (internal quotation marks omitted).)

admissible evidence . . . .") (discussing Document Request 4).)
These statements echo Rule 26(b)'s former provision regarding
"information that appears 'reasonably calculated to lead to the
discovery of admissible evidence,'" which "has been used by some,
incorrectly, to define the scope of discovery." Fed. R. Civ. P.
26, advisory committee's notes, 2015 Amendment. Because "use of
the 'reasonably calculated' phrase to define the scope of discovery
'might swallow any other limitation on the scope of discovery,'"
and prior attempts to "prevent such misuse" proved ineffective, the
Rules Committee deleted "[t]he 'reasonably calculated' phrase" from
Rule 26(b) four years ago. See id. (explaining that, despite
amendments in 2000, "[t]he 'reasonably calculated' phrase has
continued to create problems," necessitating its removal). Fox
Defendants' reliance on relevance concepts predicated on this
rejected language cannot support compelled disclosure and instead
indicates that their discovery requests overreach.

### B. Interrogatories 7-11

Turning to the specific discovery requests, Interrogatories 7
through 11 comprise the first set of disputed discovery. These
Interrogatories state:

> 7. Describe in detail whether you claim that the [LEA]
> acted contrary to law in making public the accident
> report of your [specific] traffic accident, and the basis
> for any such claim.
>
> 8. Describe in detail whether you claim that the [LEA]
> should have further redacted the accident report of your
> [traffic] accident, what items you believe [the LEA]

should have further redacted, and the basis for any such claim.

9. Describe in detail whether it is your position that members of the general public are not legally permitted to view, speak about, or write about the accident report of your [traffic] accident.

10. Describe in detail whether it is your position that some, but not all, members of the general public are permitted to view, speak about, or write about the accident report of your [traffic] accident, and if so please identify those members of the general public you believe have such rights and why.

11. Describe in detail whether it is your position that representatives of news media outlets, including but not limited to newspapers, television stations, and radio stations, are permitted to view, speak about, or write about the accident report of your [traffic] accident.

(Docket Entry 171-1 at 11-13.) Plaintiffs' discovery responses raise the aforementioned burden and relevance objections to these Interrogatories. (See, e.g., id.)

In the memorandum supporting their Motion, Fox Defendants maintain that these Interrogatories seek to elicit information regarding "Plaintiffs' theory of liability under the DPPA." (Docket Entry 171 at 14 (emphasis omitted).) According to Fox Defendants, "Plaintiffs' responses are relevant to numerous aspects of this case." (Id. at 15.) In Fox Defendants' view, "if the [LEA] violated the DPPA by publishing the Plaintiffs' personal information on the internet, that could preclude a finding of liability for any entity that later uses that information: Any injuries to the Plaintiffs' privacy interests would have been caused by someone other than the [d]efendants." (Id.) Fox

Defendants further assert that, "if the DPPA actually does punish any user of information for accessing documents published on the internet by the government, then the DPPA may violate the First Amendment." (Id.) "Finally," they assert, "any potential violation of the DPPA by [LEAs] is relevant to the scienter requirement of the DPPA claim against the Fox Defendants." (Id.)

Plaintiffs respond that Interrogatories 7-11 "focus[] squarely on Plaintiffs' states of mind and not on the legality of the police departments' actions or the other subject facts." (Docket Entry 173 at 9.) This focus on "Plaintiffs' beliefs or opinions" likewise appears in Fox Defendants' letter to Plaintiffs regarding their discovery objections. (Docket Entry 173-1 at 8.) However, Plaintiffs emphasize, the arguments that Fox Defendants proffer in support of the Motion focus on "the relevance of the police department actions, and police department redactions" rather than on the "relevance of Plaintiffs' states of mind." (Docket Entry 173 at 9 (emphasis in original).) "The distinction is significant" (id.), Plaintiffs explain, for, although their "beliefs about the actions of non-parties" have no "bear[ing] on any issue in this case" (id. at 11), "Plaintiffs are willing to serve Rule 36 admissions admitting many of the underlying facts that are the subjects of interrogatories 7-11" (id. at 9). These facts include:

> • The local [LEAs] acted contrary to law in making the subject accident reports available to the public;

• The local [LEAs] should have further redacted the subject accident reports to remove all personal information from a motor vehicle record, including names and addresses, and where applicable, the driver's license number;

• Members of the general public are legally permitted to view, speak about, or write about the subject accident reports so long as they do not obtain, disclose, or use personal information from a motor vehicle record for a use not permitted under the DPPA;

• Representatives of news media outlets, including but not limited to newspapers, television stations, and radio stations are permitted to view, speak about, or write about the subject accident reports so long as they do not obtain, disclose, or use personal information from a motor vehicle record for a use not permitted under the DPPA.

(Id. at 10 (formatting in original).)

In their reply, Fox Defendants address neither Plaintiffs' arguments regarding the asserted distinction nor Plaintiffs' offer to admit the foregoing facts. (See Docket Entry 175 at 3-7.) Instead, Fox Defendants maintain that the disputed Interrogatories "ask[] Plaintiffs whether they claim that upstream and downstream users of Plaintiffs' information are also violating the DPPA" and state that, through these Interrogatories, they "seek to learn who Plaintiffs believe could view those records, and whether Plaintiffs believe those reports were lawfully released, should have been redacted before release, or should have been withheld altogether." (Id. at 3.) As an initial matter, the Interrogatories do not ask whether "downstream users of Plaintiffs' information are also violating the DPPA" or whether the accident reports "should have

been withheld altogether" (id.).  (See Docket Entry 171-1 at 11-13.)  Moreover, Plaintiffs appear correct that the Interrogatories and meet-and-confer letter reflect a focus on "Plaintiffs' beliefs or opinions" regarding the actions of LEAs, "the general public[, and the] media" (Docket Entry 173-1 at 8), while the memoranda in support of the Motion focus on the underlying facts themselves.

Finally, many of Fox Defendants' relevance arguments lack merit, particularly given that "[e]ach distinct . . . use of personal information acquired from a state DMV must be permitted by the DPPA," Maracich, 570 U.S. at 74, and "[t]he use of that information by private actors to send direct commercial solicitations without the license holder's consent is a substantial intrusion on the individual privacy," id. at 71.  Nevertheless, Plaintiffs have offered to stipulate to certain facts, which illuminate "Plaintiffs' theory of liability under the DPPA" (Docket Entry 171 at 14 (emphasis omitted)) as it relates to each Interrogatory.  Under the circumstances, including Fox Defendants' failure to object to this approach, the Court will order Plaintiffs to provide the proffered admissions to Fox Defendants.

### C. Interrogatories 12-13, 15-17

Next, Fox Defendant seek to compel responses to Interrogatories 12, 13, 15, 16, and 17.  (See id. at 9 nn.3-4; Docket Entry 173 at 14-17; Docket Entry 175 at 7 n.1.)  These requests state:

12. Identify the date and the circumstances under which you first became aware that the [LEA] had made available to the public the accident report of your [specific] traffic accident.

13. Describe in detail all injuries you suffered as a result of the [LEA's] making available to the public the accident report of your [traffic] accident, and any basis for such claim.

\* \* \* \* \* \*

15. Describe in detail whether you have ever produced your driver's license as a means of identification in connection with buying a home or other piece of real estate, and explain each circumstance.

16. Describe in detail whether you have ever produced your driver's license as a means of identification to vote in any local, state, or national election.

17. Describe in detail whether you have ever produced your driver's license as a means of identification in connection with making a consumer purchase of any kind.

(Docket Entry 171-1 at 14-16.)  Plaintiffs objected to these requests on relevance grounds.  (See id. at 14-16.)[8]

---

    8 Plaintiffs also raised a burden objection to Interrogatory 13's "requirement to 'describe in detail'" (id. at 15) the requested information.  However, Plaintiffs do not explain how the "describe in detail" component of this particular Interrogatory "is facially burdensome" (id.) and the Interrogatory itself does not compel such a conclusion (see id. at 14).  Plaintiffs' opposition to the Motion also fails to elaborate upon this objection, aside from stating — without further detail or any citation to supporting authority — that such "command is overly broad" (Docket Entry 173 at 8).  (See id. at 1-23.)  Accordingly, in the absence of a developed argument regarding the burdensomeness of the requested information, the Court declines to sustain this objection to Interrogatory 13.  See Harford Mut., 2011 WL 2295036, at *7 ("[A] party resisting discovery must state its objection and set forth the reasons therefor with specificity.  The use of objections without explanation is not tolerated . . . ." (citations omitted)).

Fox Defendants argue that "this information is highly relevant to multiple issues in this case" (Docket Entry 171 at 9), including their first-amendment defense and Plaintiffs' standing and remedy (see id. at 9-12). More specifically, Fox Defendants maintain that the LEAs' prior disclosure of Plaintiffs' information precludes any liability for their subsequent disclosure of Plaintiffs' information and, under the First Amendment, also "bars or limits efforts to tag the Fox Defendants with liability for obtaining, using, or disclosing such public information" (id. at 10). (See id. at 9-11.) Fox Defendants further assert that Plaintiffs' prior disclosures of their personal information impacts their standing and potential damages. (See id. at 11-12 ("Fox Defendants are entitled to discover whether their informational mailers 'intruded into a private place' or whether Plaintiffs and/or the [LEAs] have torn down whatever veil of 'private seclusion' exists regarding their car accidents on public roadways.").)

The Second Amended Complaint initially limits its claim to Fox Defendants' allegedly improper obtaining and using of Plaintiffs' protected information. (See Docket Entry 180 at 2-3.) However, in delineating its DPPA claim, the Second Amendment Complaint also challenges the defendants' alleged disclosure of Plaintiffs' information without Plaintiffs' consent. (See, e.g., id., ¶¶ 149-151.) As a defense to Plaintiffs' disclosure-related contentions, Fox Defendants' Answer maintains that, inter alia, "Plaintiffs'

alleged injuries are not fairly traceable to the conduct of [Fox] Defendants because any alleged personal information had already been made public by the LEAs." (Docket Entry 97 at 27-28.) Because Plaintiffs' claim appears to encompass disclosure-related allegations, this defense renders relevant Interrogatories 12 and 13. Accordingly, the Court will grant Fox Defendants' request to compel disclosure of responses to these Interrogatories.

However, Interrogatories 15 to 17 lack relevance to Plaintiffs' claims and Fox Defendants' defenses. Because "contacting an individual is an affront to privacy even beyond the fact that a large number of persons have access to the personal information," Maracich, 570 U.S. at 67, and Plaintiffs challenge Fox Defendants' use of their protected information to send marketing mailers, Plaintiffs' use of their drivers' license for identification in voting, consumer purchases, and real estate transactions has no impact on their standing. Given that their suit seeks only injunctive relief and liquidated damages, this information likewise has little apparent relevance for their damages. Nevertheless, Fox Defendants maintain that this information remains relevant to any award of liquidated damages because such damages "are discretionary, like each of the DPPA's remedies" (Docket Entry 175 at 9). (See id. at 9-10; Docket Entry 171 at 12.)

To remedy a violation of the DPPA, a "court may award," <u>inter alia</u>, "actual damages, but not less than liquidated damages in the amount of $2,500." 18 U.S.C. § 2724(b)(1). "A plaintiff need not prove a measure of actual damages to recover liquidated damages under the DPPA, and certainly need not prove actual damages to recover the other types of remedies listed in [Section] 2724(b)." <u>Kehoe v. Fidelity Fed. Bank & Tr.</u>, 421 F.3d 1209, 1212 (11th Cir. 2005). Typically a contractual damages substitute "paid even in the absence of proof of actual damages," <u>id.</u> at 1213 (internal quotation marks omitted), "[l]iquidated damages serve a particularly useful function when damages are uncertain in nature or amount or are unmeasurable," <u>id.</u> (internal quotation marks omitted). Thus, the availability of "liquidated damages" under the DPPA likely connotes a congressional recognition of the uncertain and unmeasurable nature of privacy-related damages under the DPPA, as well as a deliberate effort to forestall the necessity of a costly, limitless foray into attempted valuation of amorphous injuries. <u>See, e.g.</u>, <u>id.</u> ("Damages for a violation of an individual's privacy are a quintessential example of damages that are uncertain and possibly unmeasurable. Since liquidated damages are an appropriate substitute for the potentially uncertain and unmeasurable actual damages of a privacy violation, it follows that proof of actual damages is not necessary for an award of liquidated damages.").

Moreover, the DPPA commits the awarding of liquidated damages (and the other enumerated remedies) to the Court's discretion. See 18 U.S.C. § 2724(b); accord Kehoe, 421 F.3d at 1217. Because damages remain a question for the Court rather than for a lay jury, it appears that Fox Defendants already possess the necessary information for their mitigation arguments. (See, e.g., Docket Entry 173-2 at 8 (admitting that, "in addition to producing [his] driver's license to law enforcement personnel in connection with" his accident, W. Garey "also produced [his] driver's license to other persons, entities or businesses as a means of identifying [him]self");[9] see also Docket Entry 173 at 15 (asserting that Plaintiffs have admitted that "each Plaintiff has also produced their driver's license to other persons, entities, or businesses as a means of identification").)[10] Accordingly, the Court will deny

_____

9 He further admitted receiving both (1) additional "mail on the same day that [he] received a law firm mailing" from the relevant defendants (id.) and (2) items of unsolicited commercial mail since May 27, 2012 (id. at 12).

10 It bears noting that Plaintiffs also offered to stipulate that (1) "[e]ach Plaintiff except W[.] Garey has produced a driver's license as a means of identification in connection with buying a home or other piece of real estate," (2) "[e]ach Plaintiff has produced a driver's license as a means of identification to vote in a local, state, or national election," and (3) "each Plaintiff has also produced his or her driver's license to other persons, entities, or businesses as a means of self-identification." (Docket Entry 173-1 at 18.) Fox Defendants rejected that offer, stating that "[they] would prefer that [Interrogatories] 15-17 be answered as posed, instead of converted to admissions responses." (Id. at 19.) The only explanation Fox Defendants gave for rejecting this proposal remains that they "are (continued...)

Fox Defendants' request to compel answers to Interrogatories 15-17. See Fed. R. Civ. P. 26(b)(2)(C)(i), (iii).

### D. Interrogatories 14, 18-20 and Document Requests 4-8

Fox Defendant further seek to compel responses to Interrogatories 14, 18, 19, and 20, as well as to Document Requests 4 through 8. (See Docket Entry 171 at 12 n.5, 20; Docket Entry 173 at 17-22.) These requests state:

> 14. Identify all entities or individuals that contacted you in writing, or orally, related in any way to your [specific] traffic accident.
>
> ******
>
> 18. Identify any insurance companies that contacted you, or the vehicle owner or person in whose name insurance was carried, by phone or in writing in connection with your [specific] traffic accident, and explain the nature of the oral or written contact.
>
> 19. Identify the full name and address of the insurance company that is reflected on the insurance policy under which you, or the vehicle owner, carried automobile liability insurance as of the date of your [specific] traffic accident.
>
> 20. Identify any tow truck or impoundment company entity or person that contacted you, or the vehicle owner or person in whose name insurance was carried, by phone or in writing in connection with your [specific] traffic accident, and explain the nature of the oral or written contact.

---

10(...continued)
entitled to answers *under oath*, as provided only by interrogatories." (Docket Entry 175 at 8 (emphasis in original).) Because the proposed stipulations would (1) answer the Interrogatories as stated and (2) "conclusively establish[]" those matters, Fed. R. Civ. P. 36(b), Fox Defendants' position appears to serve little purpose.

\*\*\*\*\*\*

4. Produce all unsolicited pieces or items of mail that you have received since May 27, 2012 from an entity or person offering or providing information regarding commercial services. Plaintiff is requested to retain all such pieces or items of mail from the date of this request forward, and to maintain them such that the day each piece or item of mail was received can later be determined and the response to this request can be supplemented.

5. Produce all pieces or items of mail that you have received since May 27, 2012 from any political candidate or political party that advocated on behalf of a political candidate or policy issue.

6. Produce all written documents sent or provided to you or a family member from any insurance company related to your [specific] traffic accident.

7. Produce all written documents sent or provided to you or a family member from any chiropractor or medical provider related to your [specific]·traffic accident.

8. Produce all written documents sent or provided to you or a family member from any tow truck or impoundment company entity or person related to your [specific] traffic accident.

(Docket Entry 171-1 at 15-17, 34-36.) Plaintiffs objected to these requests on relevance grounds, as well as, for Interrogatories 18 and 20 and Document Requests 6 and 8, on the grounds that the DPPA permits the referenced contact, rendering it lawful. (See id.) Plaintiffs further objected to Document Request 7 on the grounds that it sought privileged patient-physician communications (id. at 36) and to Document Request 4 on overbreadth grounds (id. at 34).[11]

_____

11  More specifically, Plaintiffs stated:

(continued...)

In the memorandum supporting the Motion, Fox Defendants argue that these Interrogatories and Document Requests 5 through 8 "are highly relevant — indeed fundamental" — because "[t]hey sought information about personal information used by political organizations, insurance companies, medical providers, and tow-truck businesses. The DPPA purports to immunize some of these industries from its reach. *See* 18 U.S.C. § 2721(a)[sic](6), (7). The First Amendment limits the government's ability to abridge speech using regulations that are riddled with exceptions." (Docket Entry 171 at 13.)[12] Thus, they maintain, the requested information "is relevant to the Fox Defendants' First Amendment challenge to the DPPA." (Id.) Fox Defendants further assert that Document Requests 4 and 5, which "ask[] about unsolicited mail offering commercial services, or unsolicited political mailers, all received since 2012," seek information relevant to their first-amendment defense. (Id. at 20.) According to Fox Defendants, if

11(...continued)
**Objection.  Facially over broad.**  A large volume of such junk mail is simply addressed to "resident" or to a street address, shows no connection to any particular individual, and has nothing to do with any motor vehicle or a motor vehicle accident, much less any relevant vehicle or accident.  Such mail is not relevant to any claim or defense in this action and does not implicate any privacy issues and the request to save such yet-to-be-received junk mail is overly broad.

(Id. (emphasis in original).)

12  Fox Defendants likely meant 18 U.S.C. § 2721(b)(6), (7), as 18 U.S.C. § 2721(a) contains only subsections (1) and (2).

"Plaintiffs prevail in their novel theory that the DPPA is about banning unsolicited mail, then the DPPA may be fatally underinclusive by allowing some other mailers but not the Defendants' mailers. The Fox Defendants are entitled to know about other commercial mailings to try to trace them back to their ultimate source, which may in many instances be the DMV." (Id. (citation omitted).)

As to the Interrogatories and Document Requests 5-8, Fox Defendants also argue that

> the requested information is relevant to the Plaintiffs'
> standing and damages calculation. It is necessary to
> understand the harm, if any, that Plaintiffs have
> suffered at the hands of other entities as compared to
> the harm allegedly was [sic] caused by the Fox
> Defendants. It is possible that the injuries ascribed to
> the [d]efendants may have been caused or exacerbated by
> another entity, such as one exempted from the DPPA. The
> requested information will assist the Fox Defendants in
> making these determinations.

(Id. at 14.) Finally, in their reply memorandum, Fox Defendants maintain that "other unsolicited mail . . . matters to Plaintiffs' assertion that they have standing to sue for the various injuries they allegedly suffered by receiving or retrieving such mail from [the d]efendants." (Docket Entry 175 at 12.) According to Fox Defendants, "[b]ecause Plaintiffs have put this injury in issue, [they] are entitled to discover its nature by comparing it to the injuries that Plaintiffs may daily suffer from other unsolicited mail." (Id. at 12-13.)

As a preliminary matter, Fox Defendants' arguments misconstrue the DPPA. Contrary to Fox Defendants' contentions, the DPPA does not immunize "political organizations, insurance companies, medical providers, and tow-truck businesses" from its reach. See generally 18 U.S.C. § 2721; see also Maracich, 570 U.S. at 68-71. Indeed, the DPPA makes no reference to political organizations or medical providers. See 18 U.S.C. §§ 2721-2725. It also does not limit the exemption for "use in providing notice to the owners of towed or impounded vehicles" to tow-truck businesses. 18 U.S.C. § 2721(b)(7). Further, insurance companies remain subject to the same solicitation strictures under the DPPA as other entities. See Maracich, 570 U.S. at 68-69. In addition, for the reasons discussed above, Fox Defendants' contentions regarding standing and damages fall short. Moreover, Document Requests 4 and 5, which seek more than seven years' worth of unsolicited commercial and political mail (see Docket Entry 171-1 at 34-35), remain patently overbroad and unduly burdensome, particularly given that (1), as to the named Plaintiffs, the events at issue occurred in a roughly six-month period in 2016, and (2), in any event, the DPPA prohibits "bulk distribution [of] surveys, marketing or solicitations" without the affected person's "express consent," 18 U.S.C. § 2721(b)(12). Accordingly, the Court declines to compel responses to these requests. See Fed. R. Civ. P. 26(b)(2)(C)(iii).

**E. Interrogatory 30**

Finally, Fox Defendants seek to compel a response to Interrogatory 30, which states: "Describe in detail your plan for trying the common and individualized issues of fact in this case, including the common proof that you will rely upon to try each common issue of fact." (Docket Entry 171-1 at 21.) Plaintiffs objected to this Interrogatory on the grounds that it seeks privileged work-product information and remains "overly broad and unduly burdensome and beyond the scope of reasonable discovery." (Id.)[13] Plaintiffs further noted that, "[t]o the extent not

---

13 More specifically, Plaintiffs stated:

Objection. Any plan for trial and marshalling of facts for a particular point will constitute the mental impressions, conclusions, opinions, or legal theories of Plaintiffs' attorneys and, under Rule 26(b)(3)(B), are not subject to discovery[.]

As a further objection, this interrogatory seeking trial plans and the and [sic] facts which Plaintiff intends to use at trial, and the manner in which Plaintiff intends to use those facts is overly broad and unduly burdensome and beyond the scope of reasonable discovery. *See IBP, Inc. v. Mercantile Bank of Topeka*, 179 F.R.D. 316, 322 (D. Kan. 1998) ("The interrogatory would have plaintiff itemize its evidence and trial strategy. This goes beyond the scope of reasonable discovery.").

As a further objection, the requirement to "describe in detail" the trial plan and the common proof of each factual issue is unduly burdensome on its face. "A discovery request can be overly broad or unduly burdensome on its face, in which case the proponent of discovery bears the burden of establishing its relevance." *Harford Mut. Ins. Companies v. Agean, Inc.*, No. 1:09CV461, 2011 WL 2295036, at *7 (M.D.N.C. June 8,

(continued...)

objected to above, Plaintiff[s are] leaving proof and trial plans to [their] attorneys." (Id.; see, e.g., Docket Entry 171-2 at 21.)

In countering Plaintiffs' objections, Fox Defendants maintain that, under the Rules, trial plans do not constitute work product and, alternatively, "Fox Defendants and the Court both have a 'substantial need for the materials'" because, without the trial plan, "Fox Defendants cannot determine what discovery is needed to oppose the class-certification motion"[14] and "th[e] Court cannot certify a class." (Docket Entry 171 at 22-23 (quoting Fed. R. Civ. P. 26(b)(3)(A)(ii)).)[15]  Indeed, Fox Defendants argue that "[a] district court's failure to consider the manageability of a trial plan at class certification is reversible error." (Docket Entry 175 at 14.)  However, the Court bears no obligation to compel production of, or otherwise consider, a trial plan in analyzing

_____

13(...continued)
2011) (citing *Hilt v. SFC Inc.*, 170 F.R.D. 182, 186 (D.Kan.1997 [sic])).

To the extent not objected to above, Plaintiff is leaving proof and trial plans to his attorneys.

(Docket Entry 171-1 at 21.)

14  The filing of Plaintiffs' class certification motion (see Docket Entry 184) — to which Fox Defendants have already responded (see Docket Entry 201) — moots this rationale for compelling a response to Interrogatory 30.

15  Fox Defendants also argue that Plaintiffs' burden and scope objection "[i]s nothing but a[n improper] general objection." (Id. at 21.)  However, Plaintiffs' case citation parenthetical sufficiently explains the grounds for their objection, elevating it above a mere boilerplate response.

class certification.  See, e.g., Fed. R. Civ. P. 23 advisory
committee's notes, 2003 Amendment (explaining that, "[a]n
increasing number of courts require a party requesting class
certification to present a 'trial plan' that describes the issues
likely to be presented at trial and tests whether they are
susceptible of class-wide proof," an observation that concedes the
discretionary nature of such trial plan considerations).

Moreover, the decision upon which Fox Defendants rely for
their assertion that "courts have compelled Plaintiffs to produce
'information regarding each and every cause and each common issue
that Plaintiffs contend can be resolved on a class wide basis'"
(Docket Entry 171 at 22 (quoting Horizon Sec. & Vault Complex, Inc.
v. BFI Waste Sys. of N. Am., Inc., No. Civ.A. 03-1214, 2003 WL
22326519, at *4 (E.D. La. Oct. 8, 2003))), denied the defendant's
request to compel "a detailed synopsis of the plaintiff's 'trial
plan' or 'litigation plan,'" Horizon Sec., 2003 WL 22326519, at *4.
Instead, the Horizon Sec. court ordered the plaintiff to supplement
its identification of class issues and causes, to prevent any
"eleventh hour surprises with respect to the issues that the
plaintiff maintains should be resolved on a class-wide basis," id.
A similar approach appears appropriate here.  Accordingly, the
Court will deny Fox Defendants' request insofar as it seeks to
compel a detailed trial plan and information regarding the evidence
upon which Plaintiffs "will rely," but will grant it insofar as it

seeks identification of each common issue of fact that Plaintiffs contend can be resolved on a classwide basis and each individualized issue of fact that Plaintiffs contend cannot be resolved on a classwide basis.

### III. Expense-Shifting Request

Finally, Fox Defendants seek to "be awarded their fees and expenses involved in compelling these responses." (Docket Entry 170 at 2.) Rule 37 makes expense-sifting discretionary when, as here, a motion to compel is granted in part and denied in part. See Fed. R. Civ. P. 37(a)(5)(C). Under the circumstances, the Court concludes that the parties should bear their own expenses. Accordingly, the Court will deny Fox Defendants' expense-shifting request.

### CONCLUSION

The Second Amended Complaint drops J. Garey and A. Clevenger and their claims, rendering further discovery as to them unnecessary. In addition, Plaintiffs proposed stipulations, to which Fox Defendants did not object, that resolve Interrogatories 7-11. Interrogatories 12 and 13 remain relevant to Fox Defendants' defenses; however, Interrogatories 14-20 and Document Requests 4-8 lack relevance, and Document Requests 4-5 further qualify as unduly burdensome and overbroad. Finally, Plaintiffs must identify the common and individualized issues of fact in this matter.

**IT IS THEREFORE ORDERED** that the Motion (Docket Entry 170) is **GRANTED IN PART** and **DENIED IN PART** as follows: on or before January 10, 2020, W. Garey, Aaron Cruthis, Amanda Reilly, Adilah McNeil, C. Clevenger, and Justin Brent Blakeslee must (1) serve the specified stipulations (see Docket Entry 173 at 10) to Interrogatories 7-11; (2) serve responses to Interrogatories 12 and 13; and (3) identify each common issue of fact that they contend can be resolved on a classwide basis and each individualized issue of fact that they contend cannot be resolved on a classwide basis.

This 20th day of December, 2019.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**