UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

_____
JAMES WEAVER GAREY, et al.,           )
on behalf of themselves and others )
similarly situated,                   )
                                      )
            Plaintiffs,               )
                                      )
        vs.                           ) Case No.
                                      ) 1:16-CV-542-LCB-LPA
JAMES S. FARRIN, P.C. d/b/a LAW       )
OFFICES OF JAMES SCOTT FARRIN, et     )
al.,                                  )
            Defendants.               )
_____)

VIDEOTAPED DEPOSITION OF ERIC SANCHEZ

30(b)(6) FOR JAMES S. FARRIN, P.C.

MONDAY, OCTOBER 28, 2019

RALEIGH, NORTH CAROLINA

REPORTED BY:

CANDICE GREEN

COMMISSION NO. 201424100144

EXHIBIT
**1**

1

1                    UNITED STATES DISTRICT COURT

2              FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

3     _____
      JAMES WEAVER GAREY, et al.,      )
4     on behalf of themselves and others )
      similarly situated,              )
5                                       )
                      Plaintiffs,       )
6                                       )
              vs.                       ) Case No.
7                                       ) 1:16-CV-542-LCB-LPA
      JAMES S. FARRIN, P.C. d/b/a LAW   )
8     OFFICES OF JAMES SCOTT FARRIN, et )
      al.,                              )
9                      Defendants.      )
      _____)

10

11

12

13

14

15            VIDEOTAPED DEPOSITION OF ERIC SANCHEZ, 30(B)(6)

16    FOR JAMES S. FARRIN, P.C., taken at 434 Fayetteville

17    Street, Suite 2800, Raleigh, North Carolina, beginning

18    at 9:01 a.m. and ending at 9:53 a.m., on Monday, October

19    28, 2019, before Candice Green, for StoryCloud.

20

21

22

23

24

25

                                                              2

```
 1   APPEARANCES:

 2   For the PLAINTIFF:

 3         WHITE & STRADLEY
            BY: J. DAVID STRADLEY, ESQ.
 4         3105 Charles B. Root Wynd
            Raleigh, North Carolina 27612
 5         P 919.844.0400
            stradley@whiteandstradley.com

 6

 7   For CO-DEFENDANTS:

 8         FOX ROTHSCHILD
            BY: BRADLEY M. RISINGER, ESQ.
 9             MATTHEW NIS LEERBERG, ESQ.
            Two Hannover Square
10         434 Fayetteville Street, Suite 2800
            Raleigh, North Carolina 27601
11         P 919.755.8700
            brisinger@foxrothschild.com
12         mleerberg@foxrothschild.com

13

14   For WOMBLE BOND DICKINSON DEFENDANTS:

15         WOMBLE BOND DICKINSON
            BY: ALEXANDER J. BUCKLEY, ESQ.
16         555 Fayetteville Street, Suite 1100
            Raleigh, North Carolina 27601
17         P 919.755.2137
            alex.buckley@wbd-us.com

18

19

20

21

22

23

24

25                        INDEX
```

3

```
 1   WITNESS:  ERIC SANCHEZ,

 2              30(b)(6) FOR JAMES S. FARRIN, P.C.

 3

 4   EXAMINATION BY:                              PAGE

 5   Mr. Stradley                                    6

 6

 7

 8                     INDEX TO EXHIBITS

 9   EXHIBIT              DESCRIPTION             PAGE

10   Exhibit 19     Rule 30(b)(6) Notice of Deposition   14

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

Case 1:16-cv-00542-LCB-LPA   Document 220-1   Filed 01/17/20   Page 4 of 50

```
1              DEPOSTION OF ERIC SANCHEZ
2              MONDAY, OCTOBER 28, 2019
3
4         THE REPORTER:  Good morning. We are on the
5    record to begin the deposition of Eric Sanchez in
6    the matter of James Weaver Garey, et al, v. James S.
7    Farrin et al. Today's date is Monday October 28th,
8    2019.  And the time is 9:01 a.m.
9         Would Counsel please identify yourselves and
10   state whom you represent?
11        MR. STRADLEY:  David Stradley for the
12   Plaintiffs.
13        MR. BUCKLEY:  Alex Buckley for Womble Bond
14   Dickinson Defendants.
15        MR. LEERBERG  Matt Leerberg for the remainder
16   of the Defendants.
17        THE REPORTER:  Thank you, Counsel.  I will now
18   swear in the witness.  Please raise your right hand.
19
20         (WHEREUPON ERIC SANCHEZ was duly sworn to tell
21   the truth, the whole truth, and nothing but the truth
22   was examined and testified as follows:)
23   ///
24   ///
25   ///
```

```
1                      DIRECT EXAMINATION
2    BY MR. STRADLEY
3         Q. Good morning, Mr. Sanchez.  I'm David
4    Stradley.
5         A. Good morning.
6         Q. We met a few minutes ago --
7         A. Yes, sir.
8         Q. -- off the record.  Um, we're here today to
9    take your deposition.  I'm -- get a few preliminaries
10   out of the way and then we'll get right into it.
11   Hopefully we won't be here a real long time today.
12        A. Yes, sir.
13        Q. Uh, can you tell us your first name for the
14   record, please?
15        A. Yes, sir, Eric Jason Sanchez.
16        Q. And please give us your home and your
17   professional addresses, please.
18        A. Uh, home address is 105 Considine Court,
19   Cary, North Carolina, 27519.  Work address, 280 South
20   Mangum Street, Suite 400, Durham, North Carolina, 27701.
21        Q. How are you currently employed?
22        A. I'm employed James -- by James Scott Farrin
23   as the Chief of Staff.
24        Q. How long have you been in that Chief of Staff
25   position?
```

6

Case 1:16-cv-00542-LCB-LPA   Document 220-1   Filed 01/17/20   Page 6 of 50

1      A. Oh, that position has probably been since the

2  end of, mm, 2017ish?

3      Q. How were you employed prior to the end of

4  2017?

5      A. I worked for -- I had -- for about a year and

6  a half, I worked for a consulting company called

7  Upcycle Legal, which is owned by the -- James S.

8  Farrin P.C.

9      Q. And what did you do prior to working with

10  Upcycle Legal?

11      A. Uh, so I worked at the firm in a variety of

12  capacities since March of 2000.   Um, initially I was

13  hired as the office manager and then the -- as the

14  firm grew, became, uh, Vice President and then that,

15  uh, title changed to Chief Operating Officer.

16      Q. Okay, let me, um, go through a few ground

17  rules.  Have you given a deposition before?

18      A. Uh, yes, sir, personally.

19      Q. All right, um, then since this is not your

20  first rodeo, these will probably be familiar to you

21  but, um, let's just make sure we have a common

22  understanding of how we' re gonna proceed --

23      A. Yes, sir.

24      Q. -- here today.  Uh, the first sort of ground

25  rule has to do with one of my shortcomings which is at

1  one point today I'm likely to ask you a question that

2  no reasonable human being can be expected to

3  understand.

4       If I do that, uh, or if for any other

5  reason, you need to hear one of my questions restated

6  or, um, repeated or anything else -- maybe your mind

7  wanders off, um, I use a strange combination of words

8  to you, any reason whatsoever, if you want to let me

9  know, I'll ask the question as many times or as many

10 ways as you need to -- me to ask it.

11      So that I

12 can -- so that you can understand it and, and answer

13 it.  Uh, so if you need to hear one of my questions

14 restated or repeated will you let me know?

15      A. Yes, sir.

16      Q. All right.  Um, you're doing a great job with

17 this so far but because a transcript is being created,

18 um, it's important that we know what your answers mean

19 when you make them. So if you want to say yes or no

20 to a question, please use those words as opposed to

21 shaking your head or nodding your head or saying uh-

22 huh or huh-uh.

23      That's hard for us to -- that's

24 hard for her to transcribe and us to know what you

25 meant.

1          Um, additionally, uh, I'm a pretty

2   predictable person.  So you're going to know where I'm

3   going with my questions most of the time before I'm

4   through with them.

5          If you'd let me finish for the court reporter's

6   benefit, it's hard for her to take down two people

7   talking at one time.  So if you'd let me finish my

8   question before you start answering, I'll do my best

9   to let you finish your answer before I ask you the

10  next question, all right?

11         A. Yes, sir.

12         Q. And, uh, I don't think we'll be here long

13  today but if you need a break all I ask is that you

14  answer a question that's -- any question that's

15  pending on the table before we take that break.  Fair?

16         A. Yes, sir.

17         Q. And finally, uh, I don't intend to ask you

18  any truck questions or tricky questions.  But if you

19  -- but if I ask you a question that you think is

20  tricky in any way, just stop, don't answer it and say

21  David I think that's a trick question and I'll work

22  with you to get you a question that you believe is a

23  fair question.

24         Is that a fair way to approach

25  your deposition today?

1      A. Yes, sir, I believe so.

2      Q. All right, thanks.

3       MR. LEERBERG  David, um, as we've done for

4  the other depositions, we will reserve the right to

5  designate certain portions of the transcript as

6  confidential once we have it in hand.

7      MR. STRADLEY:  Um, all right.

8  Have we made any progress on -- on that, um, issue

9  since we got deadlines on -- since I've got a motion

10  deadline on Thursday?

11      MR. LEERBERG  Yes, and my proposal is that

12  at the conclusion of this deposition, let's me and you

13  and Brad, uh, sit down and hammer that out.

14      MR. STRADLEY:  Okay.  All right.

15  BY MR. STRADLEY:

16      Q. Mr. Sanchez, tell me about, if you would, your

17  duties, um, at, uh, James S. Farrin P.C., uh, well

18  let's -- let's lay a little groundwork first of all.

19      James S. Farrin P.C. does business as the Law

20  Offices of James Scott Farrin; is that correct?

21      A. Yes, sir.

22      Q. Um, uh, tell me about your job duties, um,

23  say from May of 2012 coming forward.

24

25      A. Yes, sir, so at this time the firm had grown

www.storycloud.co | (866) 787-6774 | depos@storycloud.co

1  pretty significantly so there were a number of

2  non-attorney professionals and of course, uh,

3  shareholders and whatnot running practice areas.

4      So at this time I was more of kind of a senior,

5  um, I guess help desk if you will.  If there was any

6  kinds of issues that would, uh, come to the floor that

7  the rank and file manager or somebody had a question

8  about doing something, I would -- I would kind of

9  rotate in and, in different capacities.

10      So it might be I would -- I would help a practice

11  area with some sort of efficiency issue that might have

12  seen me there for three weeks or -- or longer at a time.

13  Very, very, uh, fluid.

14      Q. All right.  And was that, is that the case

15  sort of coming forward from May 2012 until you, um,

16  went to work with, uh, Upcycle Legal?

17      A. Yes, sir.  Upcycle was just, um, it was

18  really kind of an outward facing thing for clients. It

19  was -- my role never really changed in the -- in the

20  firm.

21      Um, essentially it was the same kind of

22  thing.  I -- Upcycle was a consultancy to assist law

23  firms in administration and, and that kind of thing.

24      So Farrin was essentially kind of internally,

25  we'd colloquially call it the first client.  So they

1  always had kind of the most favored nation status and
2  so I would just kind of assist in whatever help that
3  would be.
4      I never, uh, ceased being a member of the
5  management team.  I never ceased being a part of
6  any kind of high level discussions.
7      Q. Okay.  So, uh, and, and it sounds like then
8  that's sort of the same role you fill today; is that
9  -- is that fair?
10      A. It's a little different just because there's,
11  um, the -- the Farrin firm, there's a consulting firm
12  and then there's a software company that I kind of
13  essentially have to make sure everybody's doing what
14  they need to do and I wear a slightly different hat in
15  each of those roles.
16      Q. What's the name of the software company?
17      A. Grow Path.
18      Q. And is Grow Path also owned by James S.
19  Farrin P.C.?
20      A. No -- uh, Grow Path is owned by a separate
21  entity called Forward Holdings and then I have a
22  minority equity position of .5 percent or something
23  like that.
24      Q. All right, and who owns the -- what'd you say
25  Forward Holdings?  Who owns that?

www.storycloud.co | (866) 787-6774 | depos@storycloud.co

1

2      A. Uh, it's a majority of shareholders, uh,

3  including Jim Farrin but not all of the -- not all of

4  the James S. Farrin P.C. shareholders own Forward

5  Holdings but Forward Holdings is wholly owned by James

6  S. Farrin P.C. shareholders, is that makes sense?

7      Q. I understand.

8      A. Okay.

9      Q. I understand.  We can -- we can do a Venn

10  diagram but that would just be --

11      A. And I usually have to do that for people.

12      Q. I think I understand where you're going.  Um,

13  and does -- does Jim Farrin own a majority of Forward

14  Holdings?

15      A. Yes, sir.

16      Q. All right and he owns a majority of James S.

17  Farrin P.C.?

18      A. Yes, sir.

19      Q. Have -- so let's try to hammer out a term or

20  two.  Um, we'd been using the -- the phrase targeted

21  direct mail to refer to the practice of sending, um,

22  printed materials to individuals who have known or

23  believed to have been involved in car wrecks or motor

24  vehicle accidents.

25      Are you comfortable with that term tar -- targeted

www.storycloud.co | (866) 787-6774 | depos@storycloud.co

1    direct mail, having that definition?

2         A. Uh, we would prefer informational mailings

3    but I understand what you mean.

4         Q. Okay.  All right, let's -- while we're on

5    that topic, one of -- you're here today as a 30(b)(6)

6    witness --

7         A. Yes, sir.

8         Q. -- correct?

9         A. Yes, sir.

10        Q. On behalf of James S. Farrin P.C., correct?

11        A. Yes, sir.

12        Q. Who made the determination that you would

13   be the -- well, first of all are you the sole designee

14   to deal with the topics, uh, in 30(b)(6) notice?

15        A. Yes, sir.

16        Q. All right.  And is the 30(b)(6) notice, uh,

17   in front of you marked as Exhibit 19?

18        (Exhibit 19 marked for identification.)

19        A. Yes, sir, it is.

20        Q. And that you reviewed that document before

21   you got here today?

22        A. Yes, sir.

23        Q. One of the topics iS essentially how

24   much money you've spent on your targeted direct

25   mailing, correct?

1        A. Yes, sir.

2        Q. And so on an annual basis since about May

3    of 2012, how much has James S. Farrin P.C. spend on

4    targeted direct mail?  And you can give me a range.

5    You don't have to give me a figure for every year.

6        A. Can I give you a paragraph response with the

7    number at the end of that?

8        Q. Absolutely.

9        A. Okay.  So from 2012 to present, that number

10   is going to be fluid.  And I think one of the -- I

11   think it's -- I think it's 14, uh, on the

12   interrogatory response, it talks about the different

13   GL.

14        So you would have a percentage of an expense,

15   of a copier expense or something that would be

16   allocated towards, uh, informational mailings or -- or

17   what have you.

18        Today as we sit here speaking, the -- the cost is

19   approximately $150,000 a month.  But that would not have

20   been the cost in 2012.  It, it almost would correlate

21   based on the number of mailings that were sent out.

22        Q. Okay so we could basically take today's, um,

23   today's figure, um, and -- and equate that to $150,000

24   and then just -- just proportion that based on the

25   number of mailings to get the -- the right number?

Case 1:16-cv-00542-LCB-LPA   Document 220-1   Filed 01/17/20   Page 15 of 50

1        A. That would likely be reasonable.  Our
2    controller's pretty sharp, I mean but, yes, I mean
3    that, that would probably be reasonable.
4        Q. That'd be a good ballpark.
5        A. It would -- pro rata or something like that,
6    yes.
7        Q. Yeah, all right.  Um, it -- these
8    informational mailings as you called them, um,
9    contain, uh, a fair amount of material dedicated to
10   marketing the law firm, James S. Farrin P.C. or the
11   Law Offices of James Scott Farrin, true?
12       A. Yes, sir.
13       Q. Um, and it is safe to say that the law firm
14   would not spend $150,000 a month, uh, sending out
15   these informational mailings as you called them, if
16   they didn't contain some marketing, uh, information,
17   true?
18       A. Uh, it's pru -- true that it probably
19   wouldn't be at that volume.  I don't know that it's
20   true that the firm wouldn't send out informational
21   mailings. We have a pretty significant, um, uh,
22   altruistic endeavor where we -- we volunteer, we
23   encourage employees to do that.
24       We support different charities and that sort of
25   thing.  You can do zip code mailings to kind of inform

1  about your -- your firm or something like that.

2       So I don't know if it's true that it would be

3  zero but I think it's certainly fair that it would be

4  far less than it is.

5       Q. All right.  Um, all right.  Um, what -- what

6  involvement have you had personally with the, um, with

7  the targeted direct mailing operation since May of

8  2012 and when I say you had personally, I mean in any

9  capacity, whether it's from you know, managing it,

10  supervising it down to actually hands-on work?

11       A. Um, personally very little.  Uh, I would have

12  been, uh, if there was a question, uh, sometimes a

13  piece will be, um, submitted, uh, to ethics' counsel

14  or to the State Bar, um, uh, my opinion will be asked

15  what I think of it.

16       Over the years I've just dealt with that, that

17  kind of thing a fair amount, as you can imagine.  And

18  so, uh, things like that.  Uh, what do you think of

19  this piece. Um, but pretty superficial actually.

20       Q. All right.  So, um, I take it then in order

21  to testify about the topics and -- in the notice,

22  particularly to be a top -- topic number one, uh, in

23  the -- the subparts A through I of number one

24  you've had to do a fair amount of preparation to

25  prepare yourself to testify about those topics; is that

Case 1:16-cv-00542-LCB-LPA   Document 220-1   Filed 01/17/20   Page 17 of 50

1    fair?

2           A. Uh, it is fair.  Yes, sir.

3           Q. What have you done to prepare to testify

4    about, um, topic number one for example?

5           A. So, I talked with the people that manage the,

6    the internal process.  Um --

7           Q. Mm-hm.

8           A. -- I've, you know, toured the facility, I've

9    looked at the, the operation.  Um,  I have enough

10   institutional knowledge to know, um, you know where

11   things are kept, who talk to, that kind of thing.

12          Q. Anything else you've done to prepare to

13   testify about topic number one?

14          A. Mm, no, sir.

15          Q. How about for the remainder of the topics?

16   What have you done to -- to prepare to testify about

17   those?

18          A. Um, I've conferred with counsel when I had

19   questions.

20          Q. Okay.  Sorry about that, got co-counsel in

21   hearing this morning and I just got -- he just called

22   me and I was trying to figure out what was going on.

23   But, I don't know, he's sick and can't make it.

24          A. Oh, sorry.

25          Q. Um --

Case 1:16-cv-00542-LCB-LPA   Document 220-1   Filed 01/17/20   Page 18 of 50

1     MR. BUCKLEY:  We can -- we can take a break if

2  you want.

3     MR. STRADLEY:  Nah, I mean it's in Nashville,

4  there's nothing I can do about it.

5     MR. BUCKLEY:  Oh, I reckon not.

6     MR. STRADLEY:  I don't have a transporter.

7     THE WITNESS:  We got a plane.

8     MR. STRADLEY:  To transport.

9  BY MR. STRADLEY

10    Q. Let's then, um, sort of launch into some --

11  some of these issues.

12     What I would like to do is, um, get an

13  understanding today of the mechanics of your targeted

14  direct mail operation and by the way, when I say your,

15  I'm -- today I 'm referring to the firm James S.

16  Farrin P.C., the Law Offices of James Scott Farrin.

17     If I want your individual view of something

18  I'll try to make that clear, is that fair?

19    A. Yes, sir.

20    Q. All right.  So I'd like to get an

21  overview or a, an understanding of the mechanics of

22  the targeted direct mailing operation.

23     And it's certainly possible that some of those

24  mechanics have changed over time.  I don't know.

25  That's one of the things I'm going to rely on you to

1  -- to tell me today.

2        So what I would like to do is kind of

3  start by trying to put a time box around things and

4  then we can -- if we need to take it in pieces, uh,

5  time-wise, we can -- we can do that.

6        So what I'm interested in is the start date would

7  be the -- would be about May of 2012, okay?  And so

8  let's start with -- with this question.  Uh, has the

9  firm -- was the firm engaged in targeted direct mailing

10  in May of 2012?

11        A. Oh, yes, sir.

12        Q. And is the firm engaged in targeted direct

13  mailing today?

14        A. Yes, sir.

15        Q. Have there been any periods of time between

16  May of 2012 and today where the firm has not done

17  targeted direct mail?

18        A. No, sir.

19        Q. All right, so continuously through that

20  period?

21        A. Yes, sir.

22        Q. All right.  In terms of the -- when I

23  talk about the mechanics of the operation, I'm talking

24  about everything from, um, getting the names and

25  addresses of people that you intend to mail or

www.storycloud.co | (866) 787-6774 | depos@storycloud.co

Eric Sanchez - October 28, 2019

1  consider mailing to, through getting information to

2  the post office, FedEx, UPS, whoever is sending, okay?

3      A. (Nods head).

4      Q. And my question to you -- and this is

5  just -- this is merely for the purpose of efficiency's

6  sake today.  Is have -- have those mechanics changed

7  at all from May of 2012 through the present?

8      A. Generally speaking no.

9      Q. All right.

10     A. They're -- they're -- they're pretty amenable

11 in that sense.

12     Q. All right.  So if, if I -- if I -- so I can

13 ask you how's it done and the answer's going to be the

14 same, whether we're talking about May of 2012, today

15 or sometime in between?

16     A. Yes, sir.

17     Q. Correct?  All right.  Um, so, um, let's start

18 with, um, the, uh, let's start at the beginning which

19 is what geographic areas has the firm sent targeted

20 direct mail to over that period of time we've been

21 talking about?

22     A. Excuse me.  Uh, generally speaking, we have,

23 uh, well we do, we have a statewide subscription to

24 Digital Solutions.

25      But philosophically the firm typically sends

www.storycloud.co | (866) 787-6774 | depos@storycloud.co

Case 1:16-cv-00542-LCB-LPA   Document 220-1   Filed 01/17/20   Page 21 of 50

```
1   direct mail only in a  areas where it also advertises
2   in TV.  That's not always true but it's typically
3   true.  Meaning it 's tried to do direct mail where there
4   wasn't, um, what we would refer to internally as TV
5   support.
6        But it, it's not effective.
7        Q. Okay.  And do you find -- so I take it then
8   -- and I'm not trying to put words in your mouth but
9   just to -- uh, this is just sort of the way I talk
10  sometimes.
11       I take it then you've found that there's some
12  sort of a synergistic effect between the direct mail
13  and the television?
14       A. Um, oh, I think it's fair to say we believe
15  there's a synergistic effect to all forms of
16  communication like that.  So internet, TV, uh, word of
17  mouth, um, mailings, uh, some firms use billboards.
18  We've used them occasionally.
19       But yes so there is that kind of synergistic
20  effect to -- to, um, a messaging component.
21       Q. Well, your internet would be available
22  anywhere, correct?  Anywhere there's internet access,
23  right?
24       A. Yes, sir; yes, sir.
25       Q. But, but you're -- you've noted that a
```

www.storycloud.co | (866) 787-6774 | depos@storycloud.co

1  particular combination of TV and letters, correct?

2      A. Um, yes, but just to be clear on the, on the

3  internet, if you have a -- a local geographic -- if

4  you have an office you're searching optimization is

5  greater with the internet and sot here's greater

6  efficacy if you have that holistic package.

7      I mean it -- you, you would want an internet

8  presence where you were doing that as -- as well.

9      Q. Sure, sure.

10     A. I was just speaking specifically because that

11 was directly related to the decision to --

12     Q. And, but in term -- so in terms of there,

13 your decisions of where you actually mail letters as a

14 general proposition you've -- you have, um, tended to

15 limit your targeted direct mailing to areas where

16 you're on TV?

17     A. Yes, sir.

18     Q. All right.  Now, Digital Solutions is for

19 lack of a better term, a data aggregator?  Is that a

20 fair term?

21     A. That's what I understand them to be, yes, sir.

22     Q. All right.  And the service they provide is

23 gathering, um, up accident reports,  North Carolina

24 DMV 349 accident reports, pulling, uh, names and

25 addresses and other information off those accident

www.storycloud.co | (866) 787-6774 | depos@storycloud.co

1    reports.  Put them in -- putting it into spreadsheets

2    and then providing the spreadsheets and the accident

3    reports to people who subscribe.

4         Is that your understanding?

5         A. That is my understanding for some firms.

6    That's not the case with our firm.

7         Q. All right, what is the case for your firm?

8         A. Uh, we use them as a source of police

9    reports.  We actually found, um, that to be a little

10   bit more efficient to do the, um, the capturing of the

11   information ourselves.

12        Q. Okay.  So you're -- you're just getting, um,

13   let me -- let me ask it this way. Do you -- do you

14   receive spreadsheets from Digital Solutions?

15        A. No, sir, just police reports.

16        Q. Just police reports, all right.  How does

17   that work?  Tell me -- tell me mechanically how does

18   that work?  You get a -- you get an e-mail?  You get a

19   link?  What do you -- how do you get those?

20        A. Uh, typically it's by e-mail.  Sometimes

21   it'll be a zip file due to the volume of the, of the

22   police reports and it's expanded, say down, uh,

23   locally.

24         And then we'll have staff people that will

25   review the police report and put the appropriate

Case 1:16-cv-00542-LCB-LPA   Document 220-1   Filed 01/17/20   Page 24 of 50

1  information in spreadsheets.

2       Q. All right.  Um, and is that -- has that been

3  the case, uh, that you would get accident reports and

4  accident reports only from Digital Solutions, uh,

5  since May of 2012?

6       A. Um, that's probably the case, yes.  I mean

7  there might have been a time where we got a

8  spreadsheet initially and recognized it, it, it did

9  not -- it, it wasn't worth taking that.  So we

10  probably just said forget it, we'll do it ourselves.

11      Q. Okay.  And do you, um, do you get a discount

12  for not getting the, uh, not getting the data -- the,

13  the spreadsheet or do you know?

14      A. Oh, gosh, I'm not aware of it.  I doubt that

15  we're getting a discount.

16      Q. Okay, all right so you think you could be

17  getting spreadsheets for the same money you're paying

18  for the accident reports, but you don't know?

19      A. That's correct.

20      Q. Okay.  Um, now in the discovery responses if

21  I -- if I recall correctly, uh, there was also a, um,

22  let me -- let me -- let me back up.

23       So is it your understanding then, that you're

24  getting a copy of every accident report generated in

25  the State of North Carolina from Digital Solutions?

1      A. No, sir, it would be just the jurisdictions

2  that we're interested in, we're not -- I mean we have

3  the ability to do that.  But it would be -- that would

4  be just an incredibly insane amount of work that

5  wouldn't produce any efficiency that we would

6  otherwise gain.

7      Q. All right.  And do you, um, well, so are you

8  getting the accident -- you've got a statewide

9  subscription.

10      A. Excuse me, yes, sir.

11      Q. Are you getting the -- well, uh, let me back

12  up.  You get either a -- a -- a PDF file or a zip file

13  which contains a PDF file?

14      A. Yes.  That would be one big PDF with 15 or 20

15  or 50 different -- I mean I've seen them pretty

16  significant.  Or if there was some sort of a

17  bounce-back, we had a period of time where our e-mail

18  server would reject files that were too large and so

19  it had to be zip.

20      But it's essentially the same document, big giant

21  PDF.

22      Q. Big giant PDF.

23      A. Not like 15 individual ones.

24      Q. Are you -- are you receiving the -- since

25  you've got a statewide subscription, are you receiving

1  the PDFs for the entire state?

2      A. No, sir.

3      Q. All right.  What are you receiving?

4      A. So it's typically, for example, we would be

5  at Charlotte, State Highway Patrol,  those would be

6  two major jurisdictions that we would be receiving

7  information on from, uh, Digital Solutions on.  It's

8  more efficient to go for the State Highway Patrol with

9  Dig -- Digital Solutions than to go to 50 different

10  counties or, you know, whatever.

11      Q. All right, um, what other places are you

12  receiving, um, accident reports from Digital Solutions?

13      A. That would probably be ad hoc depending

14  on if we had a difficulty getting to a particular

15  location, um, sometimes we send somebody to a place

16  and we can't get them for, you know, they're sick or

17  PTO or something like that, you might use them for that.

18      Q. All right.

19      A. Kind of a one-off thing.

20      Q. All right so you're using Digital Solutions

21  on a regular basis only for Charlotte, um, the

22  Charlotte geographic area and the State Highway Patrol?

23      A. Uh, yes, sir, I believe that's accurate.

24      Q. All right, you're not just sending to people

25  who were involved in, uh, wrecks in Charlotte or

Case 1:16-cv-00542-LCB-LPA   Document 220-1   Filed 01/17/20   Page 27 of 50

1    investigated by the State Highway Patrol, you're not

2    just sending targeted direct mail to those folks, are

3    you?

4         A. Oh, no, sir.  No, that -- I'm just --

5         Q. Yeah.

6         A. -- speaking about Digital Solutions.

7         Q. Yeah.  Where else are you getting, um,

8    information from?

9         A. So typically we do it in four -- four ways.

10   Digital Solution would be one of them.

11        Q. Mm-hm.

12        A. Another would be that we would send people

13   locally to the LEA's, uh, local by the way, I mean to

14   the triangle.  So it's not logistically onerous to do

15   that.

16         Um, and I think --

17        Q. Which LEAs are those?

18        A. Uh, they should be listed -- I don't have it

19   in front of me but I think that they're listed in the

20   -- in the responses.

21        Q. Those are at --

22        A. Uh, the --

23        Q. -- the discovery responses are accurate?

24        A. Yes, sir.

25        Q. Okay.

1      A. Yes, sir.  Um, we spent a lot of time on

2   those, yes, sir.  Um, then there's four police report

3   -- or excuse me, LEAs that e-mail them to us directly.

4   I know Durham is one of them.  I think those are also

5   listed in the in the responses.

6      So Digital Solutions and then, um, and then we

7   would have certain, uh, police reports that we would

8   just pull off, um, off of the publicly available

9   websites.

10     Q. And what jurisdictions are those for?

11     A. Mm, I, I believe the responses will cover --

12  will cover all of that.

13     Q. Okay.

14     A. Yeah.

15     Q. All right.

16     A. I apologize, I, I, I didn't think I could

17  memorize those.

18     Q. All right.  And so then, um, once you, um, if

19  I'm understanding the process, we've gone through the

20  point -- part where you -- you acquire accident

21  reports, right? That we -- we've exhausted the -- the

22  sources of accident reports at this point in terms of --

23     A. For the informational mailings, yes, sir.

24     Q. Yeah, um, and then what do you do with the

25  accident reports once you have them?

1

2          A. So when we get a police report, um, the staff

3     will look at it based on the criteria, look at the

4     contributing factors from the accident.

5           We're only mailing to, um, the plaintiffs.

6     We're -- we would mail to the passengers as well.

7     Um, typically there's, uh, uh, a property damage

8     thresholds.  Uh, generally speaking it's a -- it's

9     $1,000 but the individual staff would have the

10    latitude to deviate from that.

11          For example we had a 1972 Volkswagen bug with

12    $500 of property damage, that might be enough to say

13    there's proximate cause there, there could be an injury.

14    We might send a piece to that and not be so rigid.  But

15    generally speaking those are -- those are the standard.

16          Q. Are there any particular fact scenarios, um,

17    that you don't -- that, that you -- you -- that you

18    eliminate from consideration from mailings?

19          A. We would typically not send a piece to

20    somebody where there was a death.

21          Q. Okay.

22          A. Um, uh, obviously if there were 33s -- uh,

23    sorry, uh, injury code, 33s on either side, we would

24    not -- we would not typically mail to that.

25          Q. Okay.  Um, any -- you know for example, um,

1  animals, uh, accidents involving animals, I mean any
2  -- any other criteria that you just exclude?
3       A. Mm, well, because they would be 33s probably.
4   I mean if, if not, I mean we wouldn't send it to a
5  driver and a deer just because you wouldn't sue -- you
6  couldn't sue the deer.
7       But, um, if there was a passenger we might send it
8  to that.
9       Q. Okay, fine.
10      A. Was that responsive, sir?
11      Q. Yes, mm-hm.
12      A. Okay.
13      Q. But no other categories of -- other than --
14  other than situations where, um, a person is
15  contributorily negligent, um, or deaths, no other
16  categorical exclusions?
17      A. You know if an employee was at fault in an
18  accident and we -- we would know about that, we
19  probably wouldn't send it to -- to that but I mean
20  it's so infrequent.  It might've happened five times
21  that I can think of.
22      Q. Okay.
23      A. But --
24      Q. Um, the data that you -- all right so
25  somebody is actually looking at the accident report

1  and making a determination as to whether to mail that

2  person, correct?

3       A. Yes, sir.

4       Q. And if -- I assume then that you don't code

5  the data for everybody involved in that accident.  You

6  just code the data for people that you -- you are

7  going to mail to; is that fair?

8       A. Sir, when you say code, what do you mean?

9       Q. Well, uh, at some point the, the information

10 on the accident report, you know, somebody's name and

11 address has got to get from the accident report onto a

12 mailing or onto an address label, right?

13      A. Yes, sir, it goes into a spreadsheet.

14      Q. Yeah.

15      A. Yes.

16      Q. And so when I say code, I mean put it into a

17 spreadsheet.

18      A. Oh, I see, okay, yes, sir.

19      Q. Um, and so when you, um, I assume you don't

20 put every -- everything off the -- everybody off the

21 accident report in the spreadsheet, do you?  You just

22 put the people who are going to be candidates for

23 getting mail; is that true?

24      A. Yes, sir.  It's also true that if there are,

25 uh, multiple people of the same family, it would be --

www.storycloud.co | (866) 787-6774 | depos@storycloud.co

1    it would be oh a single line in the, in the

2    spreadsheet the, the X family or the Y family and it

3    -- we would send it there.

4         So children you know or, you know, an adult

5    passenger, something like that.

6         Q. All right.  The -- what happens once you've

7    -- well, let me ask you this.

8         What information do you code in the spreadsheet?

9         A. So there are approximately 32 columns.  And

10   it ran -- runs the gamut from, uh, the date that it

11   was entered to a salutation, um, the address, um,

12   could be an injury code, could be gender, could be the

13   piece type, um, the LEA, a source, although the source

14   is pretty loose but the source -- so, uh, internet or

15   you know taking online or Digital Solutions might be

16   coded with like an I and it would  mean just internet,

17   if it came from the internet.

18        But there's a large -- a large number and not

19   every -- not every police report will have the

20   information that would go in the corresponding column.

21        So said another way, not every police report

22   would yield 32 columns of information if that -- if

23   that makes sense.

24        Q. Yeah, give me an example of, of say something

25   that that there's a column for but might not be on a

www.storycloud.co | (866) 787-6774 | depos@storycloud.co

Case 1:16-cv-00542-LCB-LPA   Document 220-1   Filed 01/17/20   Page 33 of 50

1   police report.

2       A. Uh, sure, um, well, uh, quite honestly the

3   number one reason would be human error. They just --

4   just didn't put it in there.

5       The other thing is that, um, this is one thing

6   to note to an earlier question. The, the spreadsheets

7   almost certainly add a column from 2012 to 2016 or

8   excuse me, 2019. Um, just because they decided to get

9   more information.

10       So it might be, um, for example on that

11   spreadsheet, um, if the person -- and this is

12   relatively recent, the person was on -- person

13   could be discovered on Facebook for example, they

14   might -- they might have a Facebook ad targeted to

15   them as well, something like that.

16       But that wouldn't have happened in 2000 --

17   wouldn't have happened in 2016 or for -- or earlier.

18       Q. All right. You're aware that, um, one of

19   the fields on a -- on an accident report for a driver

20   is whether the driver's -- is -- there's a checkbox for

21   whether the driver's, uh, address matches -- his --

22   his address on the accident report is the same as his

23   address on the driver's license.

24       You're aware of that?

25       A. Uh, yes, sir.

www.storycloud.co | (866) 787-6774 | depos@storycloud.co

1    Q. Um, is that one of the fields that your firm

2    codes?

3    A. No, sir.

4    Q. Okay.  Once the data is coded, um, what

5    happens next?

6    A. So then then the -- once it's -- so there's a

7    piece selection as well, is one of the columns.  So

8    it's not a once-size-fits-all.

9    So if you're in a motorcycle accident, you'd get

10   a motorcycle piece.  If you were in a -- if there was

11   an aggravator like a drunk driver or something you'd

12   get a piece that was more focused to that.

13   So it's fairly sophisticated in that regard.

14   And then there'll be just a monster kind of mail merge

15   of -- of labels that would just go outside of the, of

16   the envelope. You'd match up the police report and you'd

17   send the piece out, the staff would.

18   Q. All right.  Um, and you don't send

19   everybody's piece by mail, true?

20   A. Uh, yes, sir, that is accurate.

21   Q. Um, the, the, the cases that you believe are

22   -- for lack of better term, bigger cases, you may send

23   by FedEx or some sort of accelerated delivery method,

24   true?

25   A. Yes, sir.  If they have a significant injury

Case 1:16-cv-00542-LCB-LPA   Document 220-1   Filed 01/17/20   Page 35 of 50

1    they would be more likely than not to get a FedEx

2    delivery instead of a -- a mail delivery, yes, yes.

3        Q. And those people who get a FedEx delivery, do

4    they, um, also get a, um, um, more extensive package

5    than say somebody who was, um, hit at the -- at -- at

6    a red light who has a five injury code or no injury on

7    their accident report?

8        A. I don't believe so.

9        Q. You believer everybody gets the same package?

10       A. Yes, sir.  Yes, sir.

11       Q. All right.

12       A. Uh, I mean, you know whatever the piece type,

13   the -- the motorcycle guy will get a motorcycle piece.

14   Drunk driver will get a drunk driver piece.  It's not

15   like there' s a super drunk driver piece or a super

16   motorcycle piece.

17       Q. Well let me ask you this.  Uh, is there a

18   tractor trailer piece?  Or a commercial vehicle piece?

19       A. I don't believe there is a tractor trailer

20   piece.  I believe it would be a serious accident piece.

21       Q. Okay.  But let me ask you this, is the serious

22   accident piece different from the say non-serious

23   accident piece?

24       A. Yes, sir.

25       Q. And the serious accident piece is

www.storycloud.co | (866) 787-6774 | depos@storycloud.co

Case 1:16-cv-00542-LCB-LPA   Document 220-1   Filed 01/17/20   Page 36 of 50

1   considerably more extensive than the non-serious
2   accident piece, true?
3        A. Probably is additional content.  I don't --
4   wouldn't say it's significant but there might be
5   additional content.
6        Q. Okay.
7        A. I'd have to review that piece if you have --
8   to -- thorough answer.
9        Q. Um, it sounds like then all of this is done
10  in-house; is that true?
11       A. Yes, sir.
12       Q. All employees of James S. Farrin P.C. are
13  doing this --
14       A. Yes, sir.
15       Q. -- direct mailing operation?
16       A. Yes, sir.
17       Q. And, um, is it, um, are you using some sort
18  of bulk mail software or something to optimize your
19  postage rates and things of that nature?
20       A. Um, actually not, no.
21       Q. All right.
22       A. I -- that's kind of embarrassed, but no --
23       Q. You get so familiar to -
24       A. Yeah.  It just might.
25       Q. Now, the purpose for going out and,

Case 1:16-cv-00542-LCB-LPA   Document 220-1   Filed 01/17/20   Page 37 of 50

1   uh, and you -- these four methods for getting accident

2   reports, Digital Solutions, going to the Law

3   Enforcement Agencies, getting e-mails from Law

4   Enforcement Agencies and then, um, then this sort of

5   fourth method where you go pull reports from certain

6   agencies, um, you're doing all that for the purpose of

7   turning it into a mail piece, true?

8        A. Yes, sir.  Well, I -- one second.  Would

9   anybody mind if I just take a quick break just to get

10   some water?  I took some --

11        Q. Absolutely.

12        A. -- cold medicine today and so it's --

13        Q. Absolutely.

14        A. -- it's -- dry and --

15        Q. Take your -- take your time.  Absolutely,

16   we'll go off the record.

17        THE REPORTER:  We are now off the record.  The

18   time is 9:38 a.m.

19        (OFF THE RECORD)

20        THE REPORTER:  We are now back on the record.

21   The time is 9:41 a.m.

22   BY MR. STRADLEY:

23        Q. All right. Once the mail merge is complete,

24   what happens to the spreadsheets?

25        A. So, uh, the people who are in the field will

www.storycloud.co | (866) 787-6774 | depos@storycloud.co

1   keep the spreadsheet locally and the people in the

2   office will typically work off of, uh, their own

3   spreadsheet and then they're, for lack of a better

4   word, ginned up and put into one master spreadsheet.

5          That spreadsheet, um, Microsoft has a limit on

6   the size of a spreadsheet.  Typically it's -- they say

7   it's two gig but it never works out that way because

8   the data gets so difficult to manage when it's so long.

9          And so we'll have to break them up into time

10  that we -- we archive all of them.  We have all of the

11  information but it would be like, you know, May 12th

12  to some weird, like June 14, 2014 or something like

13  that.

14         But all of them should align.

15         Q. All right, in other words where, one -- one

16  will take up where the last one left off?

17         A. Yes, sir.

18         Q. All right.

19         A. You could not have all of that data in one

20  spreadsheet.

21         Q. Sure, sure. And do you have them all the way

22  back to May of 2012?

23         A. Yes, sir.

24         Q. Okay.  Is it fair to say that, um, of the,

25  um, Law Enforcement Agencies from which you are

Case 1:16-cv-00542-LCB-LPA   Document 220-1   Filed 01/17/20   Page 39 of 50

1   gathering accident reports, um, that you would have

2   gathered all the accident reports that were made

3   available by each Law Enforcement Agency from November

4   -- or excuse me, from May of 2012 through today?

5        A. Some people might have tried to do a review

6   and then scanned as they reviewed them.  So if you had

7   say 50, uh LEA X and you look and you say oh, F all, F

8   all, F all, F all, no, scan them all.

9        Some people might've said hey, there's a stack and

10  put them in there so it, it likely would be

11  inconsistent.

12       Q. All right.  You say some people might have,

13  uh, well, these people who are doing this are agents,

14  employees of James Scott Farrin P.C.?

15       A. Oh they're -- sorry, I'm sorry.  Uh, yes,

16  sir, they're employees --

17       Q. Yes.

18       A. -- sir.

19       Q. Okay so some -- some employee of James S.

20  Farrin P.C. would have gotten every accident report

21  from every Law Enforcement Agency from which you

22  harvest accident reports from May of 2012 through

23  today?

24       A. Oh, uh, I'm sorry, I was not clear.  Uh, they

25  would've had like specific, uh, employee X would've

Case 1:16-cv-00542-LCB-LPA   Document 220-1   Filed 01/17/20   Page 40 of 50

1 gone to LEA one, two, three. Employee Y would've gone

2 to four, five, six.

3 So in the -- in their universe, because it all

4 comes out in the wash. If there was 15 names that would

5 be entered onto a spreadsheet, whether they scanned them

6 all or not, it was only 15 names that had gone on the

7 spreadsheet because that's all we would mail to.

8 Q. Right.

9 A. We did not index things we didn't mail to do.

10 Q. All right, well let me just make sure I've,

11 I've got an un -- an understanding of what happened.

12 So some -- so you've given me a

13 list of -- of LEAs that -- in discovery you've given

14 me a list of LEAs that --

15 A. (Nods head).

16 Q. -- the firm got accident reports from.

17 A. Yes, sir.

18 Q. And I just want to make sure I'm clear on

19 this. Some employee of James Scott Farrin or James S.

20 Farrin P.C. would've gotten every accident report from

21 each of those Law Enforcement Agencies. Might not be

22 the same employee but an employee of --of James S.

23 Farrin P.C. would've gotten every accident report from

24 each of those Law Enforcement Agencies from May of

25 2012 through today?

41

Case 1:16-cv-00542-LCB-LPA   Document 220-1   Filed 01/17/20   Page 41 of 50

1        A. Um, no.  So --

2        Q. No, okay.

3        A. -- uh, so one person could not do all of that.

4        Q. I understand.

5        A. And so it would've been for their areas of

6    responsibility so it wouldn't have been all whatever

7    number it is on there.

8        Q. I -- I understand.  Okay, let me ask it this

9    way.  If you -- if you -- if you consider all of the

10   James S. Farrin P.C. employees sort of as a group --

11       A. Yes, sir.

12       Q. -- collective and, and consider that as the

13   firm, the firm would have gotten - - maybe not at

14   headquarters but the firm, either at headquarters or

15   via some employee would've gotten each and every

16   accident report from each of those Law Enforcement

17   Agencies listed in the discovery responses from May of

18   2012 through --

19       A. I --

20       Q. -- today?

21       A. -- I see your question.  No that's probably

22   not the case because if someone was --

23       Q. Okay.

24       A. -- in one through three and they were in the

25   process -- in their -- their kind of process was that

1  they were pre-scan -- screening before they scanned

2  them, let's just -- uh, like LEA A, then we would only

3  have the ones that we were mailing to.

4          Q. And I'm not interested in the ones you

5  actually have.  I'm -- I'm interested in whether

6  somebody actually --

7          A. That's, uh, yeah --

8          Q. -- if -- I, I'm interested in whether some

9  employee actually went out and picked them up and

10  looked at them, that's all I'm interested in.  Whether

11  they -- they --

12          A. Oh, okay.

13          Q. -- they never transmitted them to the firm or

14  not.  And, and my -- my question then is, did -- did

15  somebody with the firm, you know, pick up and look at

16  every single one of those accident reports from each

17  of the LEAs listed in discovery from May of 2012

18  through the present.

19          A. I apologize, I misunderstood.  Yes, that's

20  true.

21          Q. Okay.  Um, the firm is continuing to mail --

22  I think you told me earlier, correct, do targeted

23  direct mailing to people who've been involved in car

24  wrecks?

25          A. Yes, sir.

Case 1:16-cv-00542-LCB-LPA   Document 220-1   Filed 01/17/20   Page 43 of 50

1    Q. And is it the firm's intention to continue

2  doing that absent an injunction in this case?

3    A. Yes, sir.  Excuse me.

4    Q. You've provided some, uh, information on the

5  number of mailings that the firm sent over this period

6  we've been talking about in, in discovery.

7    A. Yes, sir.

8    Q. Are those accurate?

9    A. Yes, sir.

10    Q. And, um, do you know, um, roughly how many

11  pieces a month you're currently sending?  I don't

12  think they come up to today.  Do you know about how

13  many pieces a month you' re sending?

14    A. I don't but I could get that information.

15    Q. All right.  Um, is it more than, uh, 5,000

16  pieces a month?

17    A. I would assume so.

18    Q. All right, is it more than 10,000 pieces a

19  month?

20    A. Mm, that varies, that's getting close.

21  Sometimes it's less than -- I mean if you -- if you

22  look at the responses you'll see --

23    Q. Mm-hm.

24    A. -- it's kind of a flying fish.  Based on

25  accident and availability of staff to go get them. So,

1   but I mean I -- that's a knowable number.

2         Q. Okay, all right, but it's north of 5,000?

3         A. I would assume so, yes.

4         Q. All right, okay.  Are you aware of any, um,

5   necessary parties to this lawsuit that have not been

6   joined?

7         A. No, sir.

8         Q. Who is David Chamberlain?

9         A. David Chamberlain is the Vice President

10  of James Scott Farrin.

11        Q. Okay on the organizational chart, where is he

12  in relation to you?

13        A. Well that's a pretty good question.  Uh,

14  he has day-to-day responsibility of, um, I think

15  nearly every administrative function of James Scott

16  Farrin.

17        Um, as I indicated earlier, I'm kind of

18  in an advisory thing so if issues come up that, uh,

19  maybe he -- a little bit more challenging for him or

20  he needs more, um, he -- he wants my advice, he would

21  -- he would come talk to me on.

22        But he's typically regarded as the most senior

23  non-attorney in the firm.

24        Q. Okay.  Is it fair to say that, um, Jim Farrin

25  has been intimately involved with the decision to do

45

1   targeted direct mailing at the firm?

2       A. Um, what do you mean by intimately?

3       Q. Well, um, for example we got a lot of documents

4   that show regular meetings to discuss the direct mailing

5   operation with, with Mr. Farrin attending.

6        Is that -- uh, is that an accurate reflection

7   of his level of involvement?

8       A. Yes, sir.  He meets -- that's essentially his

9   -- his style of management so if,  uh, any -- in fact

10   I can't think of any, um, major, uh, group that he

11   doesn't meet with regularly, whether it's worker's

12   compensation or, you know, uh, marketing or anything

13   like that.

14       So it's probably -- it's true.

15       Q. All right.  I think those are my questions,

16   thank you.

17       A. Thank you, sir.

18       MR. LEERBERG  No questions.

19       MR. BUCKLEY:  No questions here.

20       THE REPORTER:  Okay, this concludes the deposition

21   of Eric Sanchez.  The time is 9:53 a.m.  We are now off

22   the record.

23

24     (Whereupon the deposition concluded at 9:53 a.m.)

25

www.storycloud.co | (866) 787-6774 | depos@storycloud.co

```
 1              DECLARATION UNDER PENALTY OF PERJURY

 2

 3         I, ERIC SANCHEZ, do hereby declare

 4    under penalty of perjury that I have read the

 5    foregoing testimony and the same is a true, correct,

 6    and complete transcription of the testimony given

 7    by me and any corrections appear on the attached

 8    errata sheet signed by me.

 9

10         EXECUTED this _____ day of _____,

11    20____, at _____,_____.

12                    (City)                 (State)

13

14

15         _____

16                    ERIC SANCHEZ

17

18

19

20

21

22

23

24

25
```

47

```
1                    CORRECTION CERTIFICATE

2

3         I, ERIC SANCHEZ, do hereby certify that I

4    have read the foregoing deposition and that, to the

5    best of my knowledge, said deposition is true and

6    accurate (with the exception of the following changes

7    listed below):

8

9    PAGE    LINE     CHANGE TESTIMONY TO READ AS FOLLOWS:

10   ____    ____     _____

11   ____    ____     _____

12   ____    ____     _____

13   ____    ____     _____

14   ____    ____     _____

15   ____    ____     _____

16   ____    ____     _____

17   ____    ____     _____

18   ____    ____     _____

19   ____    ____     _____

20   ____    ____     _____

21   ____    ____     _____

22   ____    ____     _____

23   ____    ____     _____

24

25                            _____
                              ERIC SANCHEZ
```

```
1                  CERTIFICATE OF REPORTER
2                       NOTARY PUBLIC
3

4        I, CANDICE GREEN, hereby certify that
5   the witness in the foregoing deposition was sworn to
6   tell the truth, the whole truth and nothing but the
7   truth in the within-entitled cause by me;
8        That said deposition was recorded by audio by me,
9   a disinterested person, at the time and place therein
10  stated, and that the testimony of the said witness
11  was thereafter transcribed to typewriting, by computer;
12       That I am neither attorney for nor a relative or
13  employee of any of the parties to the action; further,
14  that I am not a relative or employee of any attorney
15  or counsel employed by the parties hereto, nor
16  financially interested in its outcome.
17       IN WITNESS WHEREOF, I have hereunto set my hand
18  this 28TH day of October, 2019.
19

20                          _____
                            CANDICE GREEN
21                          COMMISSION NO. 201424100144
22

23

24

25
```

www.storycloud.co | (866) 787-6774 | depos@storycloud.co

```
1              AUDIO TRANSCRIPTIONIST AFFIDAVIT

2

3          I, the undersigned, do hereby affirm:  That the

4      foregoing electronically recorded proceedings were

5      transcribed by me to the best of my ability.

6          I further affirm I am neither a certified

7      shorthand reporter or financially interested in the

8      action, nor a relative or employee of any attorney or

9      party to this action.

10

11         IN WITNESS WHEREOF, I have this date subscribed

12     my name.

13

14     Dated:  October 28, 2019

15

16

17                    _____

18                          CAROL ROBERTS

19

20

21     4

22

23

24

25
```

50