UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

_____
JAMES WEAVER GAREY, et al.,          )
on behalf of themselves and others )
similarly situated,                  )
                                     )
                Plaintiffs,          )
                                     )
        vs.                          ) Case No.
                                     ) 1:16-CV-542-LCB-LPA
JAMES S. FARRIN, P.C. d/b/a LAW      )
OFFICES OF JAMES SCOTT FARRIN, et    )
al.,                                 )
                Defendants.          )
_____)

VIDEOTAPED DEPOSITION OF LISA LANIER

30(b)(6) FOR LANIER LAW GROUP

FRIDAY, OCTOBER 25, 2019

GREENSBORO, NORTH CAROLINA

REPORTED BY:

CANDICE GREEN

COMMISSION NO. 201424100144

**EXHIBIT 7**

1

1                UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

3    _____
     JAMES WEAVER GAREY, et al.,        )
4    on behalf of themselves and others )
     similarly situated,                )
5                                       )
                    Plaintiffs,         )
6                                       )
            vs.                         ) Case No.
7                                       ) 1:16-CV-542-LCB-LPA
     JAMES S. FARRIN, P.C. d/b/a LAW    )
8    OFFICES OF JAMES SCOTT FARRIN, et  )
     al.,                               )
9                    Defendants.        )
     _____)

10

11

12

13

14

15          VIDEOTAPED DEPOSITION OF LISA LANIER, 30(B)(6)

16   FOR LANIER LAW GROUP, taken at 300 North Greene Street,

17   Suite 1400, Greensboro, North Carolina, beginning at

18   10:09 a.m. and ending at 11:03 a.m., on Friday, October

19   25, 2019, before Candice Green, for StoryCloud.

20

21

22

23

24

25

2

```
 1    APPEARANCES:

 2    For the PLAINTIFF:

 3         WHITE & STRADLEY
           BY: J. DAVID STRADLEY, ESQ.
 4         3105 Charles B. Root Wynd
           Raleigh, North Carolina 27612
 5         P 919.844.0400
           stradley@whiteandstradley.com

 6

 7    For DEFENDANT LANIER LAW GROUP:

 8         FOX ROTHSCHILD
           BY: BRADLEY M. RISINGER, ESQ.
 9         Two Hannover Square
           434 Fayetteville Street, Suite 2800
10         Raleigh, North Carolina 27601
           P 919.755.8700
11         brisinger@foxrothschild.com

12

13    For CO-DEFENDANTS:

14         WOMBLE BOND DICKINSON
           BY: GEMMA SALUTA, ESQ.
15         One West Fourth Street
           Winston-Salem, North Carolina 27101
16         P 336.721.3600
           gemma.saluta@wbd-us.com

17

18    For LISA LANIER:

19         CAUDLE & SPEARS, PA
           BY: CASEY COGBURN, ESQ.
20         121 West Trade Street
           Suite 2600
21         Charlotte, North Carolina 28202
           P 704.338.5858

22

23

24

25
```

3

```
 1                            INDEX
 2   WITNESS:   LISA LANIER, 30(b)(6) FOR LANIER LAW GROUP
 3
 4   EXAMINATION BY:                                  PAGE
 5   Mr. Stradley                                       6
 6
 7
 8                      INDEX TO EXHIBITS
 9   EXHIBIT                DESCRIPTION              PAGE
10   Exhibit 16     Rule 30(b)(6) Notice of Deposition   8
11   Exhibit 17     Printing costs collected from
                    2012 - 2018                         22
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

4

Case 1:16-cv-00542-LCB-LPA   Document 220-7   Filed 01/17/20   Page 4 of 49

```
1              DEPOSTION OF LISA LANIER
2              FRIDAY, OCTOBER 25, 2019
3
4         THE REPORTER:  Good morning.  We are on
5    the record to begin the deposition of Lisa Lanier in the
6    matter of James Weaver Garey, et al. v. James S. Farrin,
7    et al.  Today's date is Friday, October 25, 2019, and the
8    time is 10:09 a.m.
9         Would Counsel please identify yourselves and
10   state whom you represent.
11        MR. STRADLEY:  David Stradley for the
12   Plaintiffs.
13        MR. RISINGER:  Brad Risinger for Lanier Law
14   Group.
15        MS. SALUTA:  Gemma Saluta for co-defendants.
16        MS. COGBURN:  Casey Cogburn, Lisa Lanier.
17        THE REPORTER:  I will now swear in the
18   witness.
19
20        (WHEREUPON LISA LANIER was duly sworn to tell
21   the truth, the whole truth, and nothing but the truth
22   was examined and testified as follows:)
23
24        THE REPORTER:  You may proceed.
25   ///
```

www.storycloud.co | (866) 787-6774 | depos@storycloud.co

```
 1                    DIRECT EXAMINATION
 2   BY MR. STRADLEY:
 3       Q.   Good morning, Ms. Lanier.  I'm David Stradley,
 4   we met, well, before today but certainly this morning and
 5   we're here today to take your deposition.  And we'll get
 6   a few preliminaries out of the way and get right to it
 7   and try to get you out of here.  So far -- so far my
 8   record is 50 minutes --
 9       A.   All right.
10       Q.   -- on these depositions.  But we may or may not
11   make that.
12       A.   Okay.
13       Q.   Can you tell us your name, home and professional
14   addresses, please?
15            Sure.  My name is Lisa Lanier.  My name is,
16   actually, since I got married, it's Lisa Andrews-Lanier.
17   But it is -- I still professionally use Lisa Lanier.  My
18   home address is 2608 Littleleaf Lane and that's in
19   Hillsborough 27278.  And my business address there -- our
20   accounting and our mail distribution is out of Jamestown,
21   North Carolina, 4915 Piedmont Parkway.  I think our,
22   technically, our -- our home office may be still the
23   Durham location but that's the business address I use.
24       Q.   When you go --
25       A.   For me.
```

www.storycloud.co | (866) 787-6774 | depos@storycloud.co

1     Q.   -- when you to the office, where's your primary

2     office location that you -- that you go to?

3     A.   I really don't have one that I consider primary.

4     I actually stopped keeping a desk in any one office

5     because I go to all of them.  But I spend the majority of

6     my time, I would say, between the Greensboro office and

7     the Raleigh, Durham offices.

8     Q.   All right.  And what is your current

9     occupational title?

10    A.   I'm an attorney.

11    Q.   Okay.  And are you the owner of the Lanier Law

12    Group?

13    A.   I am.

14    Q.   All right.  Are there any other owners?

15    A.   There are not.

16    Q.   Okay.  You're a lawyer.  I know you understand

17    all the -- how these depositions work.  Just a few ground

18    rules so we have a common understanding.  First one has

19    to do with one of my shortcomings.  At some point today I

20    am likely to ask you a question that no responsible human

21    being can be expected to understand.  I do that.  It's

22    not my intention to do that but if I ask you a question

23    you can't understand or maybe your mind wanders or for

24    any reason whatsoever you need to hear a question

25    rephrased or restated, let me know, I'm -- I'm happy to

www.storycloud.co | (866) 787-6774 | depos@storycloud.co

1  do that.  Okay?

2      A.    Okay.

3      Q.    Second is for the benefit of the court reporter,

4  please say yes or no, instead of uh-huh or huh-uh, if you

5  want to answer a question like that.  Helps if we don't

6  talk over one another when they're making the transcript

7  up.  And again should be a short day but if you need a

8  break, just let me know.  All I ask is that you answer

9  any pending question that's on the table before we take a

10  break, fair?

11      A.    Okay.  Sure.

12      Q.    Finally, it is not my goal today to ask you any

13  trick question or tricky question.  So if -- if I ask you

14  a question and it sounds trick -- tricky to you, just

15  don't answer it.  Say, David, That's a trick question.

16  Can I have another question?  And I'll work with you to

17  get a question you think is a fair question.  Fair way to

18  proceed with your deposition?

19      A.    Sounds good.

20      Q.    All right.  You've got a document in front of

21  you, almost, that is -- has been labeled Exhibit 16.  Is

22  that the Rule 30(b)(6) Deposition Notice for your firm?

23          (Exhibit Number 16 marked for identification)

24      A.    Yes, it is.

25      Q.    Have you reviewed that document before coming

8

1  here today?

2      A.   Yes, I have.

3      Q.   Are you the person who has been designated to

4  testify as to the topics listed in the notice?

5      A.   I am the person designated to testify.

6      Q.   Okay.  Are there any other people designated to

7  testify or are you the sole designee?

8      A.   I am the sole designee.

9      Q.   All right.

10          I can't fight with the two pages.

11     A.   Yeah.

12     Q.   Tell me what you did to prepare to testify here

13  as the 30(b)(6) designee?

14     A.   I reviewed my discovery responses and reviewed

15  the -- the notice and tried to make sure I went back

16  through business records to confirm some dates and things

17  like that.

18     Q.   All right.  There were some questions about

19  monetary amounts and -- and costs related to the -- some

20  advertising.  Did you -- did you go back and review any

21  accounting documents or compile any sort of summary or

22  anything like that to assist you?

23     A.   Yes, I did.

24     Q.   Okay.  Did you compile any other documents to

25  assist you here in testifying today?

9

Case 1:16-cv-00542-LCB-LPA   Document 220-7   Filed 01/17/20   Page 9 of 49

1    A.   I just took my discovery responses because I'm

2    not great with dates, and I tabbed dates so that I can go

3    back and give you accurate answers about dates.

4    Q.   Okay.  Great.  Other than you counsel, did you

5    speak with anyone in preparation for testifying here

6    today?

7    A.   I spoke with employees to verify information

8    related to the things we talked about, the financials and

9    things like that.

10   Q.   All right.  First, let's try to get a -- a --

11   some common -- a common definition.  We've been in these

12   depositions referring to the sending of written materials

13   to people who've been involved in car accidents as

14   targeted direct mailing, that's sort of been our term.

15   Is that -- is that a fair term, as far as you're

16   concerned for -- to refer to your firm's sending of

17   written material to people who were known or believed to

18   have been involved in a car accident?  Can we use that

19   term?

20   A.   You can use that term.  Yeah, I call it direct

21   mail but --

22   Q.   Okay.  I'm happy to call it direct mail.

23   A.   Yeah.

24   Q.   I just want to make sure we have a common --

25   A.   I'll know what you're talking about --

1    Q.   Yeah.

2    A.   -- if you use that term.

3    Q.   Oh, good.  The second, sort of, common

4  understanding, if we can, you know, if it's accurate, I'd

5  like to -- to nail down is -- is -- has to do with the

6  time periods.  So let's start with this:  Was -- was your

7  firm doing direct mail or targeted direct mail before,

8  say, May of 2012?

9    A.   Yes, we were.

10   Q.   And how long, I mean, do you still do direct

11 mail or targeted direct mail?

12   A.   Yes, we do.

13   Q.   Was there any period between May of 2012 and

14 today when you didn't do direct mail?

15   A.   There have been periods.

16   Q.   Can you testify those periods for me?

17   A.   Some of them I can and some of them I cannot.

18   Q.   All right.

19   A.   So there are times across the years when, for

20 various reasons, we would cease doing direct mail

21 because, for example, we had a server fire that took down

22 our -- all of our computer and phone systems statewide.

23 We were doing nothing except recovery for a period of

24 time.  But I know I didn't at the time have any reason to

25 document, you know, when we stopped and started.

www.storycloud.co | (866) 787-6774 | depos@storycloud.co

1          There have been other times around the holidays,

2   due to staffing, which we will commonly cease doing the

3   direct mail for a period of days.  Other times, such as,

4   there was a printer issue once, where the -- the direct

5   mail materials came with errors.  And they were important

6   errors that made it -- I think they left off the

7   disclaimer that the bar requires or something of that --

8   it's something important -- and so we had to reprint our

9   materials.  We'd run out.  And it took about three weeks,

10  you know, to -- and I -- and I didn't -- this was, you

11  know, before the initiation of this cause of action.  So

12  I had no -- no reason to document those things.  So there

13  are -- there are times like that, routinely, that

14  happens.  The one time that I can document that that

15  happened, I can look and tell you --

16      Q.   Sure.

17      A.   -- the exact date.  During the pendency of this

18  cause of action, we ceased from September 27, 2007 -- '17

19  until November 13 of 2017, we ceased.

20      Q.   All right.  And that's the only time -- that's

21  the only time frame when you weren't doing the direct

22  mail that you can, actually, put your finger on between

23  May of 2012 and today?

24      A.   Yeah.  The other times were just random times

25  that I didn't have a quantifiable stop/start kind of

www.storycloud.co | (866) 787-6774 | depos@storycloud.co

1  thing.

2      Q.   Okay.  All right.  For the -- for all the times

3  that you have been mailing, between May of 2012 and

4  today, have you -- and the reason -- let me tell you why

5  I'm asking this question, so it may help you to answer if

6  you know why I'm asking it.

7          What I'd like to do -- what I want to do is get

8  an understanding of exactly how this operation worked,

9  your direct mailing operation worked.  And so I'm happy

10  to ask you about as many different iterations of the

11  mailing procedure as there are.  But if there really is

12  only -- if it's really been done the whole -- the same

13  way the whole time that would simplify the questions.

14          And so I'm trying to figure out -- so what I'm

15  trying to figure out is have you done it the same way the

16  whole time from May of 2012 through the present?  And

17  when I say "done it the same way," I mean, you know, from

18  the manner in getting the -- the addresses and names to

19  getting them on the envelopes, to the -- the content of

20  the printed material, at least, in material respects -- I

21  understand you may change a word here or there -- but,

22  you know, have there been any changes, is the question,

23  from May of 2012 through the present that are in your

24  mind significant?  How about that?

25      A.   Yeah.  There been changes across that time.

Case 1:16-cv-00542-LCB-LPA   Document 220-7   Filed 01/17/20   Page 13 of 49

1    Q.   Okay.  So if you can come up with a more

2  efficient way to address it, I'm happy to -- to -- to go

3  with a different way.  But let's take it step by step

4  and you -- we can try to parse out any differences in the

5  steps.

6         So I want to start with where you get the data.

7  And so has that been the same the whole time you've --

8  from May of 2012 through today or have there been changes

9  in where you get the data from?

10   A.   There have been changes.

11   Q.   All right.  Let's talk about -- so let's talk

12  about that and tell me -- and, let's say, in May of 2012

13  where you were getting data?  And then we'll bring it

14  forward.

15   A.   Sure.  So May of 2012 through November of 2013,

16  I used a firm called America PI Investigations, I think,

17  they also went by America DIY and Alex Mesa's Firm.  And

18  he was the aggregator that we used to produce the public

19  records for us.

20   Q.   And you said -- can you tell spell his last name

21  for me?

22   A.   M-E-S-A.

23   Q.   M-E-S-A.  Where are they located?

24   A.   I think he's located in Greensboro but I'm not

25  positive of that.  It's been sometime since I've used

www.storycloud.co | (866) 787-6774 | depos@storycloud.co

1  him.

2      Q.   Okay.  From November of 2013, what -- what

3  happened in terms of where you got the data from?

4      A.   I switched to a company called Digital Solutions

5  of the Carolinas and I've used them since then.

6      Q.   Since I'm familiar with Digital Solutions, let's

7  talk about that for a minute and then we can go back and

8  perhaps compare and contrast that with America PI --

9           My understanding is that Digital Solutions

10  provides spreadsheets with information of people who've

11  been involved in wrecks gleaned from accident reports or

12  DMV-349s; is that what you understand?

13      A.   They -- my understanding of what Digital

14  Solutions does is they go to the public records offices

15  at local law enforcement agencies -- and each one does it

16  quite differently, I think -- you know, some -- a little

17  small town, you know, police department might put out

18  records in a box, literally, you know, they might do it

19  once or twice a week; whereas, a highway patrol office

20  might have a notebook or something a littler fancier and

21  more daily and that sort of thing.

22           And Digital Solutions then they take that public

23  information and they put it into the form of spreadsheet

24  and they also scan records that are available there.  And

25  then they send that to us in a form of -- of a

www.storycloud.co | (866) 787-6774 | depos@storycloud.co

1    spreadsheet and they also send us reports.
2        Q.   Okay.  And those spreadsheets contain certain
3    information about the people who were involved in the
4    accident, correct?
5        A.   Right.
6        Q.   Like, name, address, city, state, ZIP, whether
7    they were at fault, whether they were driver, passenger?
8        A.   Correct.
9        Q.   Injury code, injury severity code, property
10   damage amount, things of that nature?
11       A.   That's correct.
12       Q.   All right.  Was America PI, did they provide you
13   a similar service or how is their service different?  Let
14   me ask you that.
15       A.   I believe it was very similar.  I mean I haven't
16   -- it's been a long time and I -- I'd know -- I don't
17   have access to any of their actual data but, I believe,
18   that it was very similar.
19       Q.   While we're on the topic of data, what data do
20   you have that would indicate what information you
21   obtained on people who were involved in accidents?
22       A.   So we keep -- since the lawsuit, we started
23   keeping the e-mails that come from Digital Solutions, the
24   attachments, which are, you know, the spreadsheet and the
25   reports.  As well as a digital copy of letters that we

www.storycloud.co | (866) 787-6774 | depos@storycloud.co

Case 1:16-cv-00542-LCB-LPA   Document 220-7   Filed 01/17/20   Page 16 of 49

1    generated from the spreadsheet.

2        Q.    Did you keep anything prior to the lawsuit being

3    filed?  Do you have any data from before the lawsuit was

4    filed?

5        A.    We -- yeah.  We had -- before the lawsuit was

6    file -- filed, we kept just the accident reports, I

7    believe.  And that only goes back to 2013, not because we

8    didn't keep it but because that's when we had the server

9    fire that took out some data.

10        Q.    Okay.  So you were not keep but you -- you were

11    not retaining the spreadsheets but you were retaining the

12    accident reports back to -- well, you were retaining them

13    back before 2013 --

14        A.    That's correct.

15        Q.    -- you just had a server fire and you lost --

16        A.    We lost.  Right.

17        Q.    Okay.  My understanding, from speaking with

18    other defendants in the lawsuit, is that Digital

19    Solutions provided or offered data and accident reports

20    for different geographic areas around the state.  So, for

21    example, you could subscribe to the Triad area or the

22    Charlotte area or Raleigh or statewide maybe some other

23    Eastern North Carolina, maybe some other iterations.

24            Which geographic areas did you subscribe to

25    while you were -- since you've been with Digital

1  Solutions?

2      A.    Initially, we subscribed to their statewide

3  database.  We changed that in -- around, I think, around

4  May of 2016, somewhere in there.  It might have been

5  later in 2016.  Somewhere in 2016 we dropped the Eastern

6  North Carolina database.

7      Q.    And so from that point on you were only getting,

8  say from, Raleigh West; is that --

9      A.    Correct.

10     Q.    -- correct?

11     A.    That's correct.

12     Q.    All right.  Okay.  Once you -- you had the data,

13  and when I mean the data, I mean, the spreadsheet plus

14  the -- let me -- let me ask this question first.

15     A.    You know, hang on one second.  I want to make

16  sure I'm telling you the right date --

17     Q.    Sure.

18     A.    -- about when we dropped Eastern North Carolina.

19  I guess this was something that -- I need to look at my

20  dates here.  I'm terrible with dates.

21          It may have been and I can confirm this for you

22  later.  It may have been the November 2017 date that we

23  dropped Eastern North Carolina.  It was either late 2016

24  or late 2017, and I'll have to double-check that.  I

25  honestly don't recall which part.

Case 1:16-cv-00542-LCB-LPA   Document 220-7   Filed 01/17/20   Page 18 of 49

1   Q.   So it would have either corresponded to when the

2   lawsuit got filed or when you resumed after the brief

3   break after the lawsuit got filed?

4   A.   It was either when we stopped using Excalibur to

5   outsource the production of the -- which was the earlier

6   date this 2016, or it was when we resumed -- or during

7   the pendency of the lawsuit.

8   Q.   Okay.  All right.

9        MR. STRADLEY:  And, Brad, sir, can you confirm

10  that for me?

11       MR. RISINGER:  Yes.

12       MR. STRADLEY:  Thanks.

13  BY MR. STRADLEY:

14  Q.   As best you recall were you also getting a --

15  were you getting statewide data from America D -- DIY or

16  America PI?

17  A.   It varied with me, I think, at some point in

18  time, I think, I may have gotten a statewide database and

19  other points in time, I may not have -- I mean.  I am

20  sure I did not have --

21  Q.   Okay.

22  A.   -- a statewide database coming.  I think it

23  varied with them.

24  Q.   All right.  All right.  Did you ask -- let me

25  back up.

1           I understand that Digital Solutions applied

2     certain filters to the data before it was put into the

3     spreadsheets.  Is that -- is that your understanding or

4     do you -- did you -- you believe you were getting

5     everybody who were -- who was involved in a -- in a wreck

6     in a given geographic area?

7          A.   I'm really not sure what they did, as far as the

8     filtering of what they would see in the public records.

9     I think they probably filtered out things, like, a one

10    car accident, where you hit a deer or something like

11    that.  But I can't say that with a hundred percent

12    certainty.  Because I'm not that familiar with their

13    internal practices.

14         Q.   All right.  Did -- did you or did your firm ask

15    Digital Solutions to do any additional filtering, other

16    than whatever their standard filtering was at any time?

17         A.   No.

18         Q.   Once you got the data, I assume, you didn't send

19    letters to everybody who was listed on the spreadsheet,

20    true?

21         A.   That's correct.

22         Q.   I mean because it had people who were at fault,

23    for example.

24         A.   Correct.

25         Q.   What -- did -- did you retain -- or -- or maybe

1  you can just answer the question.  Can you tell me what

2  the filter criteria were to determine whether you sent

3  somebody a letter?

4          MR. RISINGER:  Just before you answer just for

5  the record, we're going to reserve our opportunity to

6  designate materials that maybe disclosed in the

7  deposition under the protective order.  Sorry to

8  interrupt.

9          MR. STRADLEY:  Sure.

10          THE WITNESS:  Would you repeat the question?

11          MR. STRADLEY:  Sure.

12  BY MR. STRADLEY:

13      Q.   The question is what were the -- if you didn't

14  send to everybody, how did you narrow it --

15      A.   Oh, right.

16      Q.   -- down?

17      A.   Oh, so that has varied over time.  There --

18  for -- there were periods of time where we would filter

19  the amount of the property damage at different levels.  I

20  would filter it at times at a thousand dollars, then

21  there'd been times when I changed that to $500.  Because

22  I would have several people come in with five and ten

23  thousand dollars of property damage that had been

24  reflected as 500 on the -- on the filtering -- on the

25  database -- or on the police report.  And so I would say,

1  "Wow, you know, they're really getting that wrong.  I'm
2  going to drop that."  So that has varied over time.
3       There have been -- we -- we certainly -- we try
4  to filter out for minors, for children, but that doesn't
5  always -- it's not always reflected whether there were
6  children but if it's obvious.  We've tried to -- various
7  times we've filtered out people who are deceased.  There
8  are times when we've not sent letters where there's a
9  death involved and other times when we have.  So those
10  things have changed sporadically over the pertinent time
11  period.
12       Q.  Okay.  Approximately, from -- say from May of
13  2012 through the present, approximately, how much money
14  have you spent on either a -- in whatever time frame is
15  easiest for you to quantify -- about how much money have
16  you spent on your direct mail operation, say, per year or
17  quarter or whatever -- whatever time frame works for you
18  to answer that question?
19       A.  Wait, I collected some data.  It's varied a bit.
20       Q.  Okay.
21       Let's just -- since you've got that, let's just
22  put a sticker on it.  We'll label that Exhibit 17.
23       (Exhibit Number 17 marked for identification)
24       A.  Sure.
25       Q.  And this is -- can you just identify --

1      A.    Sure.

2      Q.    -- Exhibit 17 for the record, please?

3      A.    Yeah.  So in preparation for this deposition, I

4   collected my printing costs -- that's what you see

5   here -- from 2012 to 2018.  These are -- there are some

6   costs related to the direct mail process that are

7   quantifiable and these are some of them.  Some are not

8   quantifiable because it's a common source of something,

9   like, postage that the rest of the firm uses, and I don't

10  track it direct to the mailers.  So you won't see postage

11  on here.

12         But these are print costs that are directly

13  related to the direct mail and only the direct mail.  So

14  the brochure costs are lists that I send a little

15  informational brochure to tell people, whether they need

16  my services or not, some important information about

17  utilizing their health insurance, how to use their med

18  pay, things like that, so they get the brochure.  The

19  direct mail envelope is a particular envelope because

20  it's preprinted with the disclaimer and things like that.

21         So these are my printing costs across that time.

22  And then you see a note at the bottom of this spreadsheet

23  that Excalibur included the number -- this is the number

24  of what I paid to Excalibur that included -- it was, sort

25  of, an all inclusive number, so that included their labor

1  and postage and everything.

2      Q.  And you -- it looks -- it looks like that number

3  stops in June of '16, that would -- that would be when

4  you stopped using Excalibur?

5      A.  I, actually, think I stopped using them a month

6  or two prior to that.  But I think they have a lag in

7  billing.  Because of -- something about calculating the

8  postage or something.  It -- it -- they ran about 30 days

9  behind.  So I want to say it was the -- maybe the end of

10  May.  And I probably didn't get the invoice until, say,

11  the end of June and paid it in early July, something like

12  that.  This is just -- the date is based off of

13  invoicing.

14      Q.  Okay.  All right.  And were you using Excalibur

15  before January of '16?

16      A.  No.  That's when I started using them.

17      Q.  All right.  So you only used them for five --

18  four, five, six months --

19      A.  Correct.

20      Q.  -- something like that?

21          All right.  Was your -- was your mailing roughly

22  at the same volume in the -- in the preceding years as it

23  was in that period of time you were using Excalibur?

24      A.  So I think you can kind infer from looking at

25  the spreadsheet, like in 2012, when the print costs were

24

1    so much lower.  I don't think we were mailing -- and this

2    is, again, that time period when my data was lost in the

3    fire.  But I don't think we were mailing statewide at

4    that point.  It's just -- that number is very low for

5    those print costs.  And that's also when we would have

6    been using DIY.  I don't, you know, or America PI,

7    whatever they call themselves.  So I would say that my

8    mailing, during the Excalibur period, was -- was more

9    consistent, you know, with the, like, you know, '17, '18

10   numbers.

11        Q.   Okay.

12        A.   But not, I think, we were mailing at a much

13   lesser volume in '12 and '13.

14        Q.   Okay.  All right.  Let me ask you this:  Looking

15   at the second page of Exhibit 17.  On -- that has figures

16   for '17 and '18 and provide some additional information

17   that's not on the first page of Exhibit 17, correct?

18        A.   It also repeats some information.  It's

19   duplicative with regards to the brochure costs and the

20   direct mail envelopes.  And it then includes the wages

21   for direct mail processing and the lead -- the monies

22   paid to -- for the leads for -- to Digital Solutions.

23             And the wages here, I'm able to quantify them in

24   '17 and '18 after we stopped using Excalibur.  Because

25   for the first time ever in '17 and '18 I started using

1   dedicated staff to do the direct mail.  Prior to using

2   Excalibur in 2016, I had always used people who performed

3   a variety of functions and then they spent a little

4   portion of their day taking turns processing the direct

5   mail.

6           And so that's why those numbers weren't included

7   on the first page because those people's wages, it's like

8   the postage, it's hard to identify how much of their

9   day -- because there were several of them -- and they

10  sort of, you know, shifted off and you did this for

11  couple hours today and maybe didn't do the next day.  And

12  so for those years it's harder to quantify the wages.

13  But once -- once I started hiring dedicated staff just to

14  do the direct mail, it is easy to quantify those wages

15  here.

16      Q.   And does -- does this -- does that number

17  include things like benefits and --

18      A.   It's just start wages.  Those were part-time

19  employees, so they weren't benefit eligible anyway.

20      Q.   Okay.  Does it include your share of social

21  security, for example, and Medicare?

22      A.   I think those are just their gross wages.

23      Q.   Okay.  The -- you've got a line on the second

24  page for direct mail lead service, which, I think, you

25  said that's Digital Solutions for '17 and '18?

1    A.   Correct.

2    Q.   Do you have any data on that prior to '17 and

3    '18?

4    A.   I think I can get the Digital Solutions' numbers

5    for '14 forward.  So I think you don't have them in here

6    for '16 -- '14, '15, and '16, I think, I can add them for

7    that.

8    Q.   All right.  Do you have an estimate --

9    A.   Oh, a caveat to that would be that, I think, it

10   would be pretty similar to what you see here.  They're --

11   they haven't really changed their pricing structure at

12   all.

13   Q.   So you'd be looking at 27- to 29-thousand

14   dollars a year --

15   A.   I think that it would be something similar to

16   that, but I can double-check and get that to you through

17   Brad.

18   Q.   Okay.  Do you have a -- a estimate -- and I'm

19   certainly not looking for precision -- but do have an

20   estimate of the -- the -- of how many pieces of direct

21   mail you have sent since, you know, in any year since,

22   say, May of 2012?

23   A.   I have no idea.

24   Q.   Is it more than ten thousand?

25   A.   More than ten thousand in a year?

Case 1:16-cv-00542-LCB-LPA   Document 220-7   Filed 01/17/20   Page 27 of 49

1      Q.   In a year?  Yes.

2      A.   Yes.  I would think so.

3      Q.   Okay.  All right.  More than a hundred thousand

4   in a year?

5      A.   I don't know.  I would be guessing.  But I would

6   think so but I am not certain.

7      Q.   Okay.  And -- any idea, ballpark, of what --

8   describe for me, if you would, the mail piece that you --

9   but, first, let me just ask a qualifying question.

10          Do you send any of these -- any of your direct

11  mail by UPS or FedEx?

12     A.   No.

13     Q.   Strictly postage?

14     A.   (Nods head up and down).

15     Q.   Strictly first-class mail?

16     A.   It is, I think, it is first-class mail.  But the

17  post office some years ago told me about some code

18  that -- or maybe Pitney Bowes told me -- about some code

19  for bulk mail that's different.  So I don't know but it's

20  just -- so, I think, that makes it slightly different

21  than traditional first-class mail.

22     Q.   All right.  But not -- nothing like -- like an

23  overnight package --

24     A.   No.  No.  No.

25     Q.   -- or priority mail --

28

Case 1:16-cv-00542-LCB-LPA  Document 220-7  Filed 01/17/20  Page 28 of 49

1    A.    No.

2    Q.    -- nothing like that?

3    A.    No.  It's just something you have to do if it's,

4  you know, if you give them a bundle of more than ten

5  things or whatever.

6    Q.    Okay.  All right.  And you save a little bit on

7  postage --

8    A.    I think you do.  I think you save five cents --

9    Q.    Okay.

10    A.    -- a piece.  Yeah.

11    Q.    Okay.  Do you have -- so describe a piece for

12  me.  Has -- first of all, has the -- has the size

13  of the -- of the -- or the shape of the direct mail piece

14  changed between May of 2012 and today?

15    A.    The envelope size might have changed a tiny bit

16  but it's been pretty consistent.

17    Q.    So as far as you know it would have been subject

18  to the same rate classification with the -- with the post

19  office the same -- to the extent the post office

20  hasn't changed --

21    A.    Right.

22    Q.    -- but as far as --

23    A.    They've changed a few times but right.  Yeah.

24    Q.    Right.  But it's, basically, been the same, more

25  or less, the same size piece the whole time?

www.storycloud.co | (866) 787-6774 | depos@storycloud.co

1    A.    That's correct.

2    Q.    And what size are we talking about?  Are we

3  talking about like a 9-by-12 like a flat envelope that an

4  8-and-a-half piece of paper would --

5    A.    It's a --

6    Q.    -- fit in without --

7    A.    It's a --

8    Q.    -- being folded or --

9    A.    It's about like this.

10    Q.    All right.

11    A.    Its what the envelope looks like.

12    Q.    Like a 6-by-9 --

13    A.    Yeah.

14    Q.    -- or something like that?

15    A.    Yeah.  Something like that.

16    Q.    All right.  And do you have any idea about what

17  the per piece cost on the -- on the postage for that is?

18    A.    The postage is 50 cents a piece.

19    Q.    Fifty cents per piece?

20    A.    Right.

21    Q.    All right.  So is it fair to say you're spending

22  on the order of 135 to 150 thousand dollars a year on --

23  on direct mail based on those kinds of numbers?

24    A.    Well, I -- in -- in 2018 it was almost a hundred

25  thousand, so I really don't know what the postage costs

www.storycloud.co | (866) 787-6774 | depos@storycloud.co

1  would be.  But I mean it wouldn't -- that wouldn't be far

2  off to say to a 130, probably.  I don't know about when

3  you go to 150.  I'm not sure if the postage is that -- I

4  don't know.

5  Q.  Okay.  All right.  The content of the -- of the

6  mailer that you send is in significant part tied to your

7  legal sources, true?

8  A.  I think the significant part of it is more

9  informational.  And I would say, I mean, as far as -- as

10  just the content, the amount of content, it's actually

11  something that potential clients and people who've

12  received the mailers, even if they didn't need my

13  services, have been very grateful for which is just a lot

14  of information.

15       And something that's kind of nice about being

16  able to send the direct mail is I can tell people that,

17  you know, the bad for-profit insurance companies that are

18  out there trying to get them to settle for $500 and close

19  down their claim, that they don't have to sign a

20  quick-hit release; that they can use their health

21  insurance; they can use their med paid.  And so a lot of

22  it is devoted to that.

23       There's a whole front and back trifold brochure

24  that is all about the informational piece.  The letter

25  itself, also, like if they -- if they were hit by a drunk

Case 1:16-cv-00542-LCB-LPA   Document 220-7   Filed 01/17/20   Page 31 of 49

```
1    driver, I let me them know that there's potentially
2    punitive damages involved.  Because laypeople don't know
3    that and they often get taken advantage of by insurance
4    companies around that.  So a lot of it is -- the majority
5    of the text is spent, I think, talking about
6    informational stuff and people appreciate that.
7         Q.   There's certainly some text in there --
8         A.   Oh.
9         Q.   -- geared toward marketing your firm?
10        A.   Most definitely.  Yeah.
11        Q.   And, in fact, you've sent --
12             MR. RISINGER:  Little bit like rock concert
13   feedback.
14             THE WITNESS:  Yeah.
15             MR. STRADLEY:  Scary when you hear your own
16   voice sometimes.
17   BY MR. STRADLEY:
18        Q.   You've never sent any of these pieces out that
19   didn't have a marketing message in them --
20        A.   Correct.
21        Q.   -- true?
22        A.   That's correct.
23        Q.   And you wouldn't -- you wouldn't be spending a
24   $130 thousand a year sending out informational mailers if
25   you couldn't include some marketing in there, would you?
```

www.storycloud.co | (866) 787-6774 | depos@storycloud.co

 1    A.   Right, of course.

 2    Q.   All right.  All right.  So let's -- let me

 3  just -- on this filter criteria point -- to circle back

 4  to that.

 5         We can identify everybody that you have -- well,

 6  we can identify everybody whose name and address you have

 7  obtained in connection with your direct mail operation

 8  since the lawsuit was filed 'cause you saved all of that,

 9  correct?

10    A.   I -- I've retained the -- since shortly after

11  the lawsuit was filed, I mean, not immediately but

12  sometime, you know, within a few weeks after that.

13    Q.   All right.  So we can identify all of these

14  people, that whose address -- addresses you've obtained?

15    A.   I believe so.

16    Q.   All right.  And we can identify -- we can also

17  identify everybody who -- to whom you have actually sent

18  a letter in that period from whenever you started saving

19  things after the lawsuit was filed --

20    A.   Yes.

21    Q.   -- correct?

22    A.   Yes.

23    Q.   And we can identify everybody back to 2013

24  whose -- whose name or address would be reflected on an

25  accident report because you've -- you've retained those

1   documents back to 2013?

2          MR. RISINGER:  I'm going to object to the form,

3   David, just for the -- using 2013, generally, with the

4   testimony with the fire.

5          MR. STRADLEY:  Right.

6          THE WITNESS:  Right.

7   BY MR. STRADLEY:

8      Q.   To the point of the server fire?

9      A.   Correct.

10     Q.   And the server fire was when in 2013, do you

11  recall?

12     A.   I think it was August but let me double-check

13  because I'm terrible with dates.  Fire was -- well, my

14  discovery response said late 2013.  It was August because

15  I was at the beach when it happened.

16     Q.   Okay.

17         MR. RISINGER:  Way to ruin a --

18         THE WITNESS:  I got a --

19         MR. RISINGER:  Way to -- ruined a vacation.

20         THE WITNESS:  I got a bad phone call.

21         MR. STRADLEY:  It literally caught on fire?

22         THE WITNESS:  A battery backup exploded and

23  caught that server on fire, which spread to the room.

24  And luckily the door was closed to the server room or it

25  would have taken the whole building.  Because --

Case 1:16-cv-00542-LCB-LPA   Document 220-7   Filed 01/17/20   Page 34 of 49

1        MR. STRADLEY:  Oh, gosh.

2        THE WITNESS:  -- that room was just engulfed.

3    And it, literally, blew back -- when the firefighter came

4    to fight the fire, it blew him backward into the wall.

5    There was so much.

6        MR. STRADLEY:  Oh, my gosh.

7        THE WITNESS:  But it took out our servers, our

8    phone system.  I mean it was -- it was bad.

9        MR. STRADLEY:  Was that in Durham?

10       THE WITNESS:  Durham, yeah.

11       MR. STRADLEY:  Durham.

12   BY MR. STRADLEY:

13       Q.   All right.  All right.  Walk me through then

14   once you've got the data, walk me through -- well, let me

15   ask this:  Has the process of, other than the filter

16   criteria, which you've already told me changed over time,

17   and, obviously, excluding the time you used Excalibur

18   because that was -- you, basically, gave them the data

19   and said run with it, right, is that the way it worked?

20       A.   They actually received the data direct from

21   Digital Solutions.

22       Q.   All right.

23       A.   But, yeah, they ran with it.

24       Q.   And they -- so you provided them -- well, they

25   got the data from Digital Solutions, paid for by you, I

35

```
 1   assume --
 2        A.   Correct.
 3        Q.   -- is that correct?
 4        A.   Right.
 5        Q.   And you had provided them whatever criteria you
 6   were using at the time for them to filter the data --
 7        A.   Correct.
 8        Q.   -- and then convert that in to a mailer?
 9        A.   Correct.
10        Q.   And then they would send it out, they took care
11   of all that, you got an invoice and paid it?
12        A.   That's right.
13        Q.   All right.  Out of curiosity why did you stop
14   doing that?
15        A.   Kind of a couple of reasons.  Number one is it's
16   just so much more costly to outsource it.  And I
17   implement quality control measures.  I have a supervisor
18   that, you know, is able when she's -- when it's done
19   under her roof, she's able to make sure it's being done
20   right and the cost.  And Excalibur I think -- I was
21   trying to remember this -- I think they were being sold
22   or something.  And the founder, with whom I was familiar,
23   was leaving the company.  And some young new people, you
24   know, that I didn't know was coming in to it.  And so I
25   moved the operation out of Excalibur and moved it into my
```

1  Jamestown office.

2      Q.    And the -- so other than -- other than the

3  Excalibur time period and other than filtering changes,

4  did the process of taking the data and turning it in to a

5  mailer and getting to the post office, has that been

6  constant from May of 2012 through today?

7      A.    Relatively, I would say.  I mean, you know, with

8  any -- I don't personally do this function in the office.

9  So staff, you know, they are given instructions on how to

10 do it, and I have quality control to make sure it's being

11 done.  So but I mean has somebody tweaked it a little bit

12 in the way they do it.  Perhaps, but relatively, within,

13 you know, the guidelines that we give them.

14     Q.    All right.  Well, explain to me how that works,

15 if you would.

16     A.    Okay.  Sure.  I actually visited my Jamestown

17 office to be sure I knew this --

18     Q.    Okay.

19     A.    -- in anticipation of this deposition.  So they

20 receive the e-mail from Digital Solutions, they open

21 it -- they open the spreadsheet.  They see the data on

22 the spreadsheet that doesn't comport with our current

23 guidelines, for example, you know, at faults and people

24 like that, people with zero property damage and things

25 like that.  They are able to click on the spreadsheet,

www.storycloud.co | (866) 787-6774 | depos@storycloud.co

1  tell it to ignore those people and hit a print-merge

2  button that automatically generates the letters from

3  there.

4          Then they collate the letters with the envelopes

5  and the police report that they've printed.  And they

6  insert the brochure, that's the informational piece, fold

7  it all up, run it through our Pitney Bowes machine, and

8  take it to the post office.  Sometimes the postal person

9  picks it up, if they happen to time it out right.

10     Q.   And do they do things like sort it by ZIP code

11  or -- and bundle it in a particular way to get better

12  deals on postage or anything like that?  Or is it just --

13  just -- they just run it through and it's in a big --

14  it's, you know, it's in a bin or whatever and take it

15  like that; is there any sorting or anything done?

16     A.   I'm not sure, I mean, they may -- not -- not by

17  my direction or not that I'm personally involved in.  But

18  they may sort it somehow for their convenience in

19  collating it.  But I don't think we get any better deal

20  by, I think, sometimes the post office wants them to

21  bundle certain quantities or not exceed a certain, you

22  know, level in the bin or whatever.  But -- I mean those

23  are things that they work out in that office with the

24  letter carrier.

25     Q.   All right.  Do you get a significant number of

Case 1:16-cv-00542-LCB-LPA   Document 220-7   Filed 01/17/20   Page 38 of 49

1   pieces returned?

2        A.   Not a significant.

3        Q.   Okay.

4        A.   Surprisingly.   There are definitely returns.

5   But I mean I wouldn't say it's like half or anything.

6        Q.   Okay.   During the time frames that you

7   identified -- let's set aside the one that you can put

8   dates on, the September to November of '17 period.

9   During those other times when you did not mail or you --

10  well, let me ask you this:   You were getting e-mails from

11  Digital Solutions with the -- with the information --

12  with the spreadsheets and the DMV-349s, correct?

13       A.   During the times when we were ceasing?

14       Q.   Let me -- let me -- I mean in -- in general, you

15  were getting e-mails with the data enclosed, as opposed

16  to going out and having to download the data?

17       A.   Correct.   It came in on e-mail.   Correct.

18       Q.   Right.   Did the -- did you stop your Digital

19  Solutions subscription at any point from May of 2012

20  through today?

21       A.   During that time period when we ceased during

22  the pendency of the action that I can identify.   Here we

23  go.   I can tell you the date.   We ceased getting the

24  e-mails then.

25       Q.   Okay.

www.storycloud.co | (866) 787-6774 | depos@storycloud.co

1    A.   Let's see that was right about --

2    Q.   You gave me 9/27/2017 to 11/13/17 earlier?

3    A.   Yeah.  I think that's right.  I think we ceased

4  getting the e-mails for about month in there.  I mean it

5  may not have corresponded a hundred percent with those

6  dates but roughly.

7    Q.   All right.  And did you -- but as -- as regards

8  to regards to other periods when you would stop, say --

9  well, let me back up.

10        Obviously, if you stopped for, you know, holiday

11  staffing issues, you wouldn't have stopped your Digital

12  Solutions subscription for a few days around Christmas or

13  Thanksgiving, correct?

14    A.   Yeah.  I don't think we ever stopped.  Other

15  than, I think, we stopped getting the e-mails when the

16  server fire happened for a time period.  If we had

17  gotten them, we couldn't have received them anyway, but,

18  I mean, 'cause, literally, we were taken down.  So I

19  think there may have been a time in there where we did.

20  But other than, no.  We wouldn't turn it on and off.

21    Q.   Okay.  How long were you -- had you stopped --

22  what I would like for you to do is give me a date range

23  that would -- would -- that you would be confident would

24  include the period that you stopped for the server fire.

25  Even if it's a little too -- even if they're -- your date

1  range is a litter broader than once you've actually
2  stopped getting the messages from Digital Solutions.
3        So can you give me -- can you identify that
4  period of time?  So, for example, you server catches fire
5  in August --
6      A.   Right.
7      Q.   And so if we start the -- the -- if we, say,
8  from beginning in 8/1, you stopped getting e-mails from
9  Digital Solutions, even though we know you probably
10  didn't stop on 8/1 --
11      A.   Right.
12      Q.   -- because your server burned up on 8/1 --
13      A.   Right.
14      Q.   -- but if we say, you didn't -- if we start 8/1,
15  what would be a date after which you know you would have
16  been getting Digital Solutions e-mails after your
17  recovery from the server fire?
18      A.   I would think it would be, you know, maybe a
19  month, something like that.
20      Q.   All right.  So you think if we went to October
21  1, we can say with confidence that you were getting --
22  you had resumed getting Digital Solutions e-mails?
23  Because we don't know exactly when in -- in August you
24  went down --
25      A.   Yeah.

41

```
1      Q.   -- so a month --
2      A.   I would think certainly by October.  Yeah.
3      Q.   All right.  Okay.  All right.  So that would be
4   August 1 of '13 --
5      A.   And the fire was not on the first, so I would
6   say --
7      Q.   Right.
8      A.   -- it was sometime in August, probably,
9   mid-August or something.
10     Q.   All right.  I just want to make sure --
11     A.   Like, maybe the tenth, ninth.  I don't know.
12     Q.   And I don't mind telling you why.  If -- if --
13     A.   Yeah.
14     Q.   -- if somebody complains that my class
15   definition is too broad because you were not getting
16   spreadsheets for some period of time, I want to make
17   absolutely sure that we have a period of time that
18   everybody can agree would, at least, encompass the period
19   of time that you were not getting --
20     A.   Right.
21     Q.   -- those spreadsheets --
22     A.   So we've cleared the backup date.
23     Q.   -- right --
24     A.   I got you.
25     Q.   Yeah.  It's got to be a little broad --
```

www.storycloud.co | (866) 787-6774 | depos@storycloud.co

1    A.    Yeah.

2    Q.    -- in time.

3    A.    I got you.

4    Q.    At any point did you filter who you mailed to

5    based on who the investigation agency for the automobile

6    accident was?

7    A.    No.

8    Q.    My understanding is that there's some sort of

9    parallel coverage litigation going on between your firm

10   and North Carolina Farm Bureau; is that -- is that

11   correct?

12   A.    That's correct.

13   Q.    Where does that stand at present?

14        MR. RISINGER:  I'm -- I'm just going to object

15   because it's not in the notice.  But if you have personal

16   knowledge of it, you can answer.

17        THE WITNESS:  There was a motion that my

18   attorney Rick Pinto defended with regard to -- it -- it

19   got a little bit confusing about the ruling.  Because

20   the -- the judge sort of said one thing and then the

21   order kind of said something else.  But, essentially, it

22   has been appealed.  That was a motion to dismiss.

23   BY MR. STRADLEY:

24   Q.    All right.

25   A.    You know, in the declaratory judgment action.

43

Case 1:16-cv-00542-LCB-LPA   Document 220-7   Filed 01/17/20   Page 43 of 49

1     Q.   Right.  And you, obviously, took a position that
2  there should be coverage --
3     A.   Correct.
4     Q.   -- in the case Farm?
5     A.   Right.
6          MR. STRADLEY:  Does your -- and I'm -- you have
7  a line of objection to this because I appreciate it's not
8  in the --
9          MR. RISINGER:  Fair.
10 BY MR. STRADLEY:
11    Q.   Is it -- is it your understanding that the --
12 that the policies are not identical from the -- for the
13 whole period that is involved in this litigation, say,
14 back beginning in 2012 up through today, that those
15 policy provisions may have changed somewhat over the time
16 period?
17    A.   I don't -- I don't really -- I don't really
18 know.  But I don't -- I don't have knowledge of a great
19 deal of change in the policy provisions.
20    Q.   All right.  Are you aware of any persons or
21 entities that you contend are necessary parties to this
22 litigation who have not been joined?
23    A.   At the time I'm not.  No.
24    Q.   All right.
25         MR. STRADLEY:  Going slow today.

44

1          MR. RISINGER:  You know, I'm just sort of

2     watching the clock over your head there, you know,

3     wondering if you were going to get your record or not.

4          MR. STRADLEY:  You can do that today.  I

5     think -- I think those are my questions.

6          MR. RISINGER:  I have no questions.

7          MS. SALUTA:  No questions.

8          MS. COGBURN:  No questions.

9          MR. STRADLEY:  All right.  Why don't we can go

10    off?  So I have a couple of -- something I want to talk

11    to you about.

12          MR. RISINGER:  Yep.

13          THE REPORTER:  This concludes the

14    deposition of Lisa Lanier.  The time is 11:03 a.m.  We

15    are now off the record.

16

17          (Whereupon the deposition proceeding was

18               concluded at 11:03 a.m.)

19

20

21

22

23

24

25

45

DECLARATION UNDER PENALTY OF PERJURY

     I, LISA LANIER, do hereby declare under penalty of perjury that I have read the foregoing  testimony and the same is a true, correct, and  complete transcription of the testimony given by me  and any corrections appear on the attached errata  sheet signed by me.

     EXECUTED this _____ day of _____, 20____, at _____,_____.
              (City)             (State)

_____
LISA LANIER

www.storycloud.co | (866) 787-6774 | depos@storycloud.co

```
 1                CORRECTION CERTIFICATE

 2

 3        I, LISA LANIER, do hereby certify that I

 4   have read the foregoing deposition and that, to the

 5   best of my knowledge, said deposition is true and

 6   accurate (with the exception of the following changes

 7   listed below):

 8

 9   PAGE    LINE      CHANGE TESTIMONY TO READ AS FOLLOWS:

10   ____    ____      _____

11   ____    ____      _____

12   ____    ____      _____

13   ____    ____      _____

14   ____    ____      _____

15   ____    ____      _____

16   ____    ____      _____

17   ____    ____      _____

18   ____    ____      _____

19   ____    ____      _____

20   ____    ____      _____

21   ____    ____      _____

22   ____    ____      _____

23   ____    ____      _____

24

25                              _____
                               LISA LANIER
```

www.storycloud.co | (866) 787-6774 | depos@storycloud.co

```
1              CERTIFICATE OF REPORTER
2                   NOTARY PUBLIC
3

4        I, CANDICE GREEN, hereby certify that
5   the witness in the foregoing deposition was sworn to
6   tell the truth, the whole truth and nothing but the
7   truth in the within-entitled cause by me;
8        That said deposition was recorded by audio by me,
9   a disinterested person, at the time and place therein
10  stated, and that the testimony of the said witness
11  was thereafter transcribed to typewriting, by computer;
12       That I am neither attorney for nor a relative or
13  employee of any of the parties to the action; further,
14  that I am not a relative or employee of any attorney
15  or counsel employed by the parties hereto, nor
16  financially interested in its outcome.
17       IN WITNESS WHEREOF, I have hereunto set my hand
18  this 28TH day of October, 2019.
19

20                         _____
                           CANDICE GREEN
21                         COMMISSION NO. 201424100144
22

23

24

25
```

48

```
1              AUDIO TRANSCRIPTIONIST AFFIDAVIT

2

3         I, the undersigned, do hereby affirm:  That the

4    foregoing electronically recorded proceedings were

5    transcribed by me to the best of my ability.

6         I further affirm I am neither a certified

7    shorthand reporter or financially interested in the

8    action, nor a relative or employee of any attorney or

9    party to this action.

10

11        IN WITNESS WHEREOF, I have this date subscribed

12   my name.

13

14   Dated:  October 28, 2019

15

16                _____

                            CHELSEA FELCHER
17

18

19

20

21

22

23

24

25
```