IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

WILLIAM PARKER GAREY, et al., )
*on behalf of themselves and others similarly situated*, )
)
Plaintiffs, )
)
v. ) 1:16CV542
)
JAMES S. FARRIN, P.C., et al., )
)
Defendants. )

**MEMORANDUM OPINION AND ORDER**

LORETTA C. BIGGS, District Judge.

Plaintiffs initiated this action alleging that the above-named Defendants violated the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721, *et seq.*, by obtaining their names and addresses from automobile accident reports and using that information to advertise legal services. (ECF Nos. 1; 32; 180.) Before the Court are Plaintiffs' motions to strike pursuant to Rule 37 of the Federal Rules of Civil Procedure and Rule 702 of the Federal Rules of Evidence, (ECF Nos. 288; 290), and cross-motions for summary judgment pursuant to Rule 56, (ECF Nos. 262; 270; 272). In addition, the two Andrews-Lanier Defendants also move for summary judgment on Plaintiffs' supplemental state claim that they violated North Carolina's Uniform Voidable Transfers Act ("UVTA"), N.C. Gen. Stat. § 39-23.1, *et seq.* (ECF No. 264.) For the reasons set forth below, the Court grants in part and denies in part Plaintiffs' motions to strike, and the Court grants Defendants' motions for summary judgment.

## I. BACKGROUND

The DPPA holds liable certain parties for the misuse of a driver's information if that data has been collected from a "motor vehicle record." 18 U.S.C. § 2724(a). In their complaint,[1] the six named Plaintiffs allege that they were each involved in car accidents in 2016. (ECF No. 180 ¶¶ 42–47.) In each accident, either local police officers or North Carolina State Highway Patrol troopers investigated and recorded their findings on a standard DMV-349 form that was then provided to the state's Division of Motor Vehicles ("DMV"). (*Id.*; *see also, e.g.*, ECF No. 206-8 at 2.) To complete the form's driver identification fields, the investigating officers first asked each Plaintiff for his or her driver's license before then (a) copying all of the needed information onto a paper form by hand, (b) entering all of the information manually into an electronic version of the form, or (c) auto-populating the form either by typing the license number into a computer or by scanning a barcode on the back of the license. (*See* ECF No. 180 ¶¶ 50–51.) In each instance, the investigating officers also asked the Plaintiff whether the information on his or her license was accurate. (*Id.* ¶ 52.) When each Plaintiff answered in the affirmative, the officer checked a box to indicate that the address entered onto the form matched the address on the driver's license. (*Id.*)

In the weeks that followed, Plaintiffs received unsolicited marketing materials from various North Carolina attorneys and law firms, including Defendants, who had obtained their names and addresses from their respective DMV-349s. (*See* ECF Nos. 32-1 through 32-32; 180 ¶¶ 54–114.) In some cases Defendants collected information from Plaintiffs' DMV-349s

---

[1] The complaint referenced throughout this Opinion is the Second Amended and Supplemental Complaint, (ECF No. 180).

themselves, and in other cases they purchased accident report data aggregated by a third party. (*See, e.g.*, ECF Nos. 220-1 at 24–25; 220-7 at 15–16.) Plaintiffs do not argue that the DMV-349 reports are themselves "motor vehicle records." (*See* ECF No. 263 at 17–20.) Rather, they contend that the information included in the report may be traced back to such records and thus fall under the ambit of the DPPA. (*Id.*) Therefore, the central question forming the basis of this lawsuit is whether, as Plaintiffs allege, Defendants' conduct in gathering personal information from DMV-349s and using it to market legal services is a violation of the DPPA.

## II.  MOTIONS TO STRIKE

Prior to analyzing the motions for summary judgment, the Court considers Plaintiffs' motions to strike the declarations of two expert witnesses.

### A.  *Motion to Strike Declaration of Rhonda Harper*

Plaintiffs first move to strike the declaration of expert witness Rhonda Harper pursuant to Rule 37. (ECF No. 288.) They argue that Defendants violated Rule 26 by "failing to completely disclose Harper's expert opinions to be offered in this case." (ECF No. 289 at 1.) More specifically, they contend that Defendants stated Ms. Harper would offer expert testimony on "the response rate of direct mail," and that her initial expert report merely included "statistics on the deliverability of mail generally, deliverability of direct mail solicitations, opening rates of direct mail solicitations, and the direct mail response rates as well as how some of those statistics have changed over time." (*Id.* at 2.) Plaintiffs allege, however, that her subsequent declaration covers significantly wider ground, such as the "history of direct marketing"; the methods data brokers use to collect, buy, and sell consumer information; and DMV practices of selling personal information. (*Id.* at 2–3 (citing ECF No.

3

269-13 ¶¶ 20–85).) Defendants counter that Ms. Harper "merely takes documents which were collected in discovery and puts them in the context of [her] earlier report." (ECF No. 301 at 5.)

Rule 26 requires a party introducing expert testimony to provide a written report that includes "a complete statement of all opinions the witness will express." Fed. R. Civ. P. 26(a)(2)(B)(i). As Plaintiffs have correctly pointed out, a failure to fulfill these requirements "unfairly inhibits [the opposing party's] ability to properly prepare" for trial. *Saudi v. Northrop Grumman Corp.*, 427 F.3d 271, 278 (4th Cir. 2005). It therefore results in a party forfeiting their opportunity to use the information—"unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

To determine whether the addition of new information in an expert report falls under one or both exceptions, the Fourth Circuit considers the following five factors:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003). The first four factors relate primarily to the harmlessness exception, while the final factor tests whether the initial exclusion of information was substantially justified. *Id.* The Court now applies these factors to Ms. Harper's expert report.[2]

---

[2] In addition to arguing that the additional testimony is both substantially justified and harmless, Defendants contend that the additions fall under Rule 26(e), (ECF No. 301 at 12–13), which compels an expert witness to supplement their report "if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing," Fed. R. Civ. P. 26(e). The Court leaves aside the question of whether Rule 26(e) is applicable to the new disclosures for now given that the issue may be resolved using the more comprehensive *Southern States* test which takes the context of the additions into account.

The first factor weighs the extent to which the information in the report surprised the opposing party. Plaintiffs assert that they "had no reason to know that Harper would testify as to anything other than those topics provided in her expert report." (ECF No. 289 at 6.) Yet Defendants note that Ms. Harper stated in her original report that, "should additional information be provided or obtained," she reserved the right to amend her opinion. (ECF No. 301 at 14.) Plaintiffs subsequently filed their Second Amended Complaint and provided additional documents to Defendants through the discovery process. (*Id.*) The Court concludes it was thus foreseeable that Ms. Harper's review of the extensive new data— including nearly one billion DMV records from nine different states, (*id.*)—might lead to a need for additional context in her report. Though Plaintiffs might have been genuinely surprised, the new discovery combined with Ms. Harper's statement that she might amend her original statement leads the Court to find that this factor weighs in favor of Defendants, if only slightly.

The second factor is the ability of the party to cure the surprise. Though Plaintiffs might have had more time to depose Ms. Harper between the filing of the new report and a trial, they argue that they are unable to depose or cross-examine her at the summary judgment stage. (ECF No. 289 at 7.) The Court, therefore, finds that this factor weighs in favor of the report's exclusion. That said, the third and fourth factors—potential disruption to the trial and importance of the evidence—weigh heavily against striking the report. As it relates to the third factor, there is no indication that such evidence would disrupt the trial given that no trial date has been set. Further, as it relates to the fourth factor, Plaintiffs point out that "Defendants relied on Harper's testimony to attack both Plaintiffs' standing argument and

5

Case 1:16-cv-00542-LCB-LPA   Document 331   Filed 01/22/21   Page 5 of 20

First Amendment arguments." (*Id.* at 9.) However, the Court, in making its determination, does not rely on either of those arguments, as detailed below. With regards to the fifth factor that weighs a party's explanation for its failure to disclose, Defendants contend that the additional information is substantially justified because the documents Ms. Harper reviewed "led her to explain them in the context of this case," and they argue that the paragraphs in question merely "summarize the voluminous third-party discovery." (ECF No. 301 at 4–5.) The fact that Ms. Harper could not have provided such summaries prior to receiving the new information weighs in favor of finding that the initial omission was justified.

The Court's finding in an earlier opinion that Plaintiffs have standing, (ECF No. 313 at 3–13)—combined with the lack of need to resolve First Amendment questions here—weigh most heavily in finding that the evidence is not important. It further undermines the need for Plaintiffs to depose the witness prior to a judgment on the merits. The Court therefore finds this additional information harmless and declines to strike Ms. Harper's declaration.

  B. *Motion to Strike Declaration of Victoria Nourse*

Plaintiffs next move to strike the Declaration of Victoria Nourse, (ECF No. 290), the Ralph V. Whitworth Professor of Law at Georgetown University Law Center and Executive Director of Georgetown's Center on Congressional Studies, (ECF No. 269-14 at 3). Plaintiffs contend that Professor Nourse's report impermissibly "seeks to introduce expert testimony on the law, and is therefore inadmissible under Federal Rule of Evidence 702." (ECF No. 291 at 1.) Defendants, on the other hand, argue that her declaration merely "summarizes in a methodical fashion voluminous pages of Congressional records." (ECF No. 302 at 2.)

6

The proffer of expert opinion may raise a number of complex issues for trial courts, but "the line must be drawn between proper expert evidence as to facts, the inferences to be drawn from those facts, and the opinions of the expert, on the one hand, and testimony as to the meaning and applicability of the appropriate law, on the other hand." *Adalman v. Baker, Watts & Co.*, 807 F.2d 359, 366 (4th Cir. 1986), *abrogated on other grounds by Pinter v. Dahl*, 486 U.S. 622 (1988). While courts often depend on the experience of expert witnesses to make plain the factual complexities of individual cases, "experience is hardly a qualification for construing a document for its legal effect when there is a knowledgeable [person] in a robe whose exclusive province it is to instruct the jury on the law. . . ." *Id.* at 367 (quoting *Marx & Co., Inc. v. Diner's Club Inc.*, 550 F.2d 505, 512 (2d Cir. 1977)). Further, where a party proffers an expert witness to testify on "the meaning and applicability of the [pertinent] laws to the transactions" at issue, the Fourth Circuit has found that such testimony "flies squarely in the face of the precedent—and the logic of that precedent." *Id.* at 368.

As Defendants note, Professor Nourse does indeed provide the Court with helpful summaries of the DPPA's voluminous legislative history, including evolving versions of the statute's text, Congressional debate on the impact of the law, and side-by-side comparisons of the original bill with later amendments. (*See generally* ECF 269-14.) Nevertheless, Plaintiffs are correct to point out that Professor Nourse does offer her interpretation on a number of aspects of the law. For instance, she writes that the DPPA "regulates, but does not prevent, direct marketing." (*Id.* ¶ 23.) Further, though Professor Nourse does not perhaps assert a direct answer to the "ultimate questions" in this case, she applies the law to its facts multiple times, such as when she asserts that a representative's statements "reinforce, or *confirm*, the

7

plain language of the statute . . . in which legislators specifically crafted provisions to protect access to records deemed public under a State's laws." (*Id.* ¶ 33 (echoing, or providing the basis for, Defendants' argument that records which were made "freely available to the public" are beyond the scope of the statute (ECF No. 271 at 1–2)).)

"[D]istrict courts have wide-ranging control over management of their dockets, the courtroom procedures, and the admission of evidence," *U.S. v. Janati*, 374 F.3d 263, 273 (4th Cir. 2004), and are empowered to strike portions of a document without striking the whole, *see Tomblin v. WCHS-TV8*, 434 Fed. App'x 205, 212 (4th Cir. 2011) (affirming a district court decision to strike "only the inadmissible material and . . . not prevent[ing] [plaintiff] from using other portions of the affidavits" at issue). Such a remedy is appropriate here. The Court grants Plaintiffs' Motion to Strike this declaration to the extent that it advances a particular interpretation of the DPPA or applies Professor Nourse's expertise to resolve questions of how the law should be applied in the instant case. The Court, however, declines to strike the entire document.

## III. MOTIONS FOR SUMMARY JUDGMENT

The Court next considers cross-motions for summary judgment. Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568 (4th Cir. 2015) (internal citations and quotations omitted). "It is axiomatic that in deciding a motion for summary judgment, a district court is required to view the evidence in the light most favorable to the nonmovant" and to "draw all

8

Case 1:16-cv-00542-LCB-LPA   Document 331   Filed 01/22/21   Page 8 of 20

reasonable inferences in his favor." *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019) (citing *Jacobs*, 780 F.3d at 568). That means that a court "cannot weigh the evidence or make credibility determinations," *Jacobs*, 780 F.3d at 569 (citations omitted), and thus must "usually" adopt "the [nonmovant's] version of the facts" even if it seems unlikely that the moving party would prevail at trial, *Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011) (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)). Where, as in this case, the Court has before it cross-motions for summary judgment, the Court reviews each motion separately to determine if either party is entitled to judgment as a matter of law. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003).

    *A.    DPPA Claims*

The DPPA prohibits a state DMV from knowingly disclosing "personal information" outside of fourteen permitted exceptions. 18 U.S.C. § 2721(a)–(b). It defines "personal information" as "information that identifies an individual"; this includes a driver's name and address but not information on vehicular accidents or driving violations. *Id.* § 2725(3). The DPPA additionally prohibits any "authorized recipient" from reselling or redisclosing this information unless the recipient's use also falls under one of the fourteen exceptions, with special rules for those exceptions that require express consent or that pertain to bulk requests. *Id.* § 2721(c). The statute does not define the term "authorized recipient," *Gordon v. Softech Int'l, Inc.*, 726 F.3d 42, 49 (2d Cir. 2013), but the Supreme Court has held that the DPPA regulates the resale and redisclosure of personal information "by private persons who have obtained that information from a state DMV," *Reno v. Condon*, 528 U.S. 141, 146 (2000) (citing the DPPA's "[r]esale or redisclosure" subsection of 18 U.S.C. § 2721(c)).

9

A party may bring a civil action under the DPPA against a person "who knowingly obtains, discloses or uses personal information, from a motor vehicle record," for purposes not otherwise permitted. 18 U.S.C. § 2724(a). The statute defines "motor vehicle record" as a "record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card" issued by a DMV. *Id.* § 2725(1). Remedies for a violation include damages, attorney fees, or any other preliminary or equitable relief as determined by the court. *Id.* § 2724(b).[3]

Plaintiffs contend that there are sufficient undisputed facts on the record for the Court to conclude that they have met their burden to demonstrate civil liability under the DPPA as a matter of law. (ECF No. 263 at 2–3.) Defendants counter that the DPPA does not prohibit their alleged conduct and argue, among other things, that the statute as applied by Plaintiffs violates the First Amendment. (ECF No. 271 at 1–2, 7–42.)

As detailed above, very few facts in this case are in dispute. Both parties agree, for instance, that Defendants obtained Plaintiffs' names and addresses from DMV-349 accident reports completed by law enforcement officers. Plaintiffs do not allege, however, that Defendants collected these reports from a state DMV, nor do they contend that DMV-349s are themselves "motor vehicle records" under the DPPA. Based on the plain language of the statute and courts' subsequent interpretations of it, these facts alone are sufficient for the Court to find that the alleged activity falls outside the DPPA's scope. Having discussed the statutory language above, the Court now turns to the case law.

---

[3] This Court has previously found that Plaintiffs in the instant case may seek liquidated damages even without pleading an economic loss. (*See* ECF No. 313 at 13–15.)

10

Case 1:16-cv-00542-LCB-LPA   Document 331   Filed 01/22/21   Page 10 of 20

*1.* Reno *and* Maracich

There are only two Supreme Court cases that have considered causes of action implicating the DPPA. The first, *Reno v. Condon*, held that the Act was a valid exercise of the Commerce Clause and did not violate the Tenth or Eleventh Amendments to the U.S. Constitution in its regulation of state action. 528 U.S. at 148–51. In the second, *Maracich v. Spears*, a divided Court held that a law firm's solicitation of prospective clients in anticipation of a lawsuit did not fall under the DPPA's litigation exception found in § 2721(b)(4) while withholding judgment on whether this use might fall under another of the statute's fourteen exceptions. 570 U.S. 48, 77–78 (2013). Neither ultimate holding, on its own, is particularly relevant to the instant case.[4] Both cases, however, describe the DPPA in some depth and, in addition to analyzing the language of the Court, it is also instructive to discuss the ways in which subsequent cases have applied their precedents.

For instance, as discussed briefly above, the Court in *Reno* found that the DPPA "regulates the resale and redisclosure of drivers' personal information by private persons who have obtained that information from a state DMV." *Reno*, 528 U.S. at 146 (citing 18 U.S.C. § 2721(c)). Courts have subsequently emphasized the phrase "from a state DMV" to conclude that, for the DPPA to apply, "[t]he private actors themselves must have obtained the information from a state motor vehicle agency in order to be liable for disclosing it." *Ocasio v. Riverbay Corp.*, No. 06-CIV-6455, 2007 WL 1771770, at *1 (S.D.N.Y. June 19, 2017); *see also*

---

[4] Though Plaintiffs cite *Maracich* in support of their proposition that the plain language of the DPPA prohibits Defendants' activities, (*see* ECF No. 263 at 1–2, 37), the *Maracich* defendants obtained personal information directly from the state DMV, *Maracich*, 570 U.S. at 52, instead of through a third party as Defendants did here. As discussed below, this is a distinction that nearly every court interpreting the DPPA has found to be meaningful.

11

Case 1:16-cv-00542-LCB-LPA   Document 331   Filed 01/22/21   Page 11 of 20

*Fontanez v. Skepple*, 563 Fed. App'x 847, 849 (2d Cir. 2014). Likewise, in a case where a plaintiff provided their driver's license to a prison official, the Second Circuit held that "[w]here the personal information at issue is not obtained from a state DMV, no DPPA cause of action can be found." *Fontanez*, 563 Fed. App'x at 849 (holding that the statute was not intended to "create a cause of action for every misuse of information on a driver's license voluntarily provided as proof of identity"). In one oft-cited decision where a plaintiff provided their license to a retail clerk in order to return a purchased item, the Eleventh Circuit cited *Reno* as a basis for dismissing the case and held that, "[o]n its face, the Act is concerned only with information disclosed, in the first instance, by state DMVs." *Siegler v. Best Buy Co. of Minn., Inc.*, 519 Fed. App'x 604, 605 (11th Cir. 2013).

Thirteen years after *Reno*, the Court in *Maracich* considered the statute's legislative history and provided "at least two" animating concerns for lawmakers in writing the DPPA: first, "a growing threat from stalkers and criminals who could acquire personal information from state DMVs" and, second, uneasiness around "the States' common practice of selling personal information to businesses engaged in direct marketing and solicitation." *Maracich*, 570 U.S. at 57. Such concerns, while not necessarily exhaustive, suggest that a reading of the statute as applying only to direct DMV interactions is well-founded.

Indeed, courts have cabined the reach of the DPPA by citing this very passage. For instance, such legislative history led the Ninth Circuit to "interpret § 2721—prohibiting DMVs from 'knowingly disclos[ing] . . . personal information'—as covering one side of the prohibited transaction" while § 2722, "by contrast, covers the *other* side of that *same transaction*, by creating liability for the person who 'obtain[s] or disclose[s] personal information' from the DMV's

12

records." *Andrews v. Sirius XM Radio Inc.*, 932 F.3d 1253, 1259–60 (9th Cir. 2019) (second emphasis added) (internal citation omitted). The court ultimately held, among other things, that under such a reading a "driver's license in the possession of its owner is no longer maintained by the DMV, and so such a record is outside the bounds of the DPPA." *Id.* at 1260.

    2.    *Courts Have Found DPPA Violations When Data Is Purchased from the DMV Directly*

Some courts have understandably suggested that the DPPA could be too "easily thwarted" if plaintiffs are required to demonstrate a direct line between personal information found in a DMV database and the subsequent use of that data. *Gaston v. LexisNexis Risk Sols., Inc.*, No. 5:16-CV-00009-KDB-DCK, 2020 WL 5235340, at *10 (W.D.N.C. Sept. 2, 2020). That said, courts have not hesitated to award summary judgment to plaintiffs in cases where defendants have acquired the protected information from the DMV directly. One example of this is *Kehoe v. Fidelity Federal Bank and Trust*, 421 F.3d 1209, 1210–11 (11th Cir. 2005), where a bank purchased personal information from a state DMV in order to solicit owners of motor vehicles who might consider refinancing their car loans. Likewise, the court in *Pichler v. UNITE*, 446 F. Supp. 2d 353, 359, 373 (E.D. Pa. 2006), granted plaintiffs' motion for summary judgment when unions hired an information broker to obtain records directly from a state DMV in order to learn the names and addresses of workers whose license tags they copied from cars parked outside a manufacturing plant.

These decisions suggest that the DPPA, as interpreted by courts, is not ineffective in preventing the particular types of privacy risks identified in *Maracich*. Though it is arguably true that the statutory language might be stretched further to encompass a much broader range

13

of conduct, the DPPA need not apply to every use of a name or address that may somehow be traced back to a state DMV in order for Congress's important public policy goals to be advanced.

### 3. *Courts Regularly Dismiss Claims Not Involving Direct Interaction with State DMVs*

On the other hand, when defendants have not interacted with the DMV directly nor through a hired agent, courts have consistently dismissed DPPA claims. For instance, one case with a similar fact pattern to the instant matter dismissed a plaintiff's complaint when the defendant allegedly obtained the plaintiff's driver's license number from court documents. *See Kresal v. Secura Ins. Holdings, Inc.*, No. 17-cv-766-wmc, 2018 WL 2899694 (W.D. Wis. June 11, 2018). Though neither party alleged that the documents themselves were motor vehicle records, the plaintiff alleged that the license number found therein had been copied from an accident report completed by an officer using the plaintiff's driver's license. *Id.* at *1. The court, found, however, that the DPPA did not reach this far. Instead, it held that the "crucial" factor in a DPPA claim was where the plaintiff accessed the personal information in question rather than the nature of the information itself. *Id.* at *3, *4 (quoting *Dahlstrom v. Sun-Times Media*, 777 F.3d 937, 949 (7th Cir. 2015) ("[T]he [DPPA] is agnostic to the dissemination of the very same information acquired from a lawful source.")). Therefore, the court dismissed the claim and found that the information was not obtained from a motor vehicle record as a matter of law. *Id.* at *4.

A district court in Delaware similarly dismissed a DPPA claim in *Hurst v. State Farm Mutual Automobile Insurance Company*, No. 10-1001-GMS, 2012 WL 426018 (D. Del. Feb. 9, 2012), highlighting three considerations in its decision. First, it concluded that, in order to be

14

a "motor vehicle record," a document "must be issued by the DMV." *Id.* at *10. Second, it found that the complaint did not allege that "defendants performed a search with any state DMV or that they caused a DMV search to be made by a third party." *Id.* Third—after observing that the information was obtained at one point "directly from the plaintiff"—it held that "any subsequent disclosure of that 'personal information' is not a DPPA violation." *Id.* (citing *Ocasio*, 2007 WL 1771770, at *6 and *O'Brien v. Quad Six, Inc.*, 219 F. Supp. 2d 933 (N.D. Ill. 2002) (where the court found that a bar did not violate the DPPA when it collected its patrons' driver's licenses at its door, recorded them on video, and then sold the information to marketers)). Ultimately, the court in *Hurst* held that "[t]he lack of allegations establishing that [the plaintiff's] personal information was obtained by the defendants from any state DMV [was] fatal to his claim." *Id.*

In a similar vein, district courts likewise dismissed plaintiffs' claims of DPPA violations in *Fontanez*, 563 Fed. App'x at 849 (where a license was provided at a corrections facility), *Siegler*, 519 Fed. App'x at 605 (where a license was provided to a retailer), and *Figueroa v. Taylor*, No. 06-civ-3676, 2006 WL 3022966, at *1, *2 (S.D.N.Y. Oct. 23, 2006) (where an employer provided plaintiff's home address to a newspaper after obtaining it from plaintiff's learner's permit provided as requirement for employment).

    *4. Similar Cases Surviving Motions to Dismiss Are Often Decided at Summary Judgment*

Those cases not involving a direct interaction with a state DMV that do survive motions to dismiss have nevertheless regularly been decided for defendants at the summary judgment stage. One oft-cited example of this is *Whitaker v. Appriss, Inc.*, 266 F. Supp. 3d 1103, 1104–05 (N.D. Ind. 2017), in which a plaintiff sued a man who ran a website that provided

15

crash reports to the DMV and to the public. At the motion to dismiss stage, the court provided what seems to be a more expansive view of which documents were covered under the DPPA, holding that, if the original source of a government agency's information is a state DMV, "the DPPA protects the information throughout its travels." *Whitaker v. Appriss, Inc.*, No. 3:13-cv-826, 2014 WL 4536559, at *4 (N.D. Ind. Sept. 11, 2014). Yet the same court, in a subsequent order, was clear that the chain of liability was not unlimited in scope, holding unequivocally that the "name, address, and driver's license numbers written down or scanned from a driver's license handed over by the license-holder isn't 'personal information, from a motor vehicle' protected by the DPPA" before awarding summary judgment to defendants. *Whitaker*, 266 F. Supp. 3d at 1107, 1110.

More recently, a district court awarded summary judgment to defendants after finding that "a driver license, although it contains 'personal information' contained in the records of the DMV, is not itself a 'record' 'contained in the records' of the DMV." *Andrews v. Sirius XM Radio, Inc.*, No. ED CV 17-1724 PA, 2018 WL 1406911, at *4, *7 (C.D. Cal. Jan. 9, 2018), *affirmed by Andrews v. Sirius XM Radio, Inc.*, 932 F.3d 1253 (9th Cir. 2019). To suggest that a license is a motor vehicle record, it concluded, "would render the definition's use of both 'record' and 'pertains to' as surplusage because the driver license would be 'pertaining' to itself and ignore the requirement that it also be a 'record.'" *Id.* at *4. Citing to the grant of summary judgment in *Whitaker*, the court additionally observed that viewing a license as a motor vehicle under the DPPA would lead to "strange and far-reaching results," such as criminalizing the

16

conduct of a Good Samaritan who returned a lost wallet to its owner by using the address found on the license inside.[5] *Id.*

### 5. *More Expansive Views of DPPA Liability*

Plaintiffs' arguments, however, are not entirely novel. For instance, some courts have concluded that a driver's license is, in fact a "motor vehicle record" under the DPPA. *See Eggen v. WESTconsin Credit Union*, No. 14-cv-873-bbc, 2016 WL 4382773, at *3 (W.D. Wis. Aug. 16, 2016) (finding that "defendant's argument that a driver's license is not a 'motor vehicle record' is difficult to take seriously"); *see also Hatch v. LexisNexis Sols., Inc.*, No. 3:19-cv-00449-KDB-DCK, 2020 WL 1042256, at *3 (W.D.N.C. March 3, 2020) (summarizing the varying ways in which courts have approached this question).

Further, at least one court has found that, when a person was under a "legal compulsion to turn over his or her driver's license to a government actor," the DPPA could be extended to cover information on a traffic accident report. *Pavone v. Law Offs. of Anthony Mancini, Ltd.*, 205 F. Supp. 3d 961, 966–67 (N.D. Ill. 2016) (drawing a distinction between providing a license to a police officer at the scene of an accident and cases like *Fontanez* in which a plaintiff provided their license to gain access to a prison). This doctrine has not gained traction, however. As the court in *Whitaker* held, "[t]here's no strong basis for using voluntariness to determine DPPA coverage" given that "[n]o language in the statute alludes to this distinction." *Whitaker*, 266 F. Supp. 3d at 1110.

---

[5] The court in *Whitaker* defined the word "pertains," in the context of the DPPA, as "to belong as a part, member, accessory, or product." *Whitaker*, 266 F. Supp. 3d at 1108 (quoting *Lake v. Neal*, 585 F.3d 1059, 1061 (7th Cir. 2009)). Therefore, it concluded that "[a] driver's license isn't a part, member, accessory, or product of a motor vehicle's permit; it *is* a motor vehicle's permit." *Id.*

17

### 6. *Application to the Instant Case*

As discussed above, it is undisputed that Defendants obtained the names and addresses of Plaintiffs from DMV-349 accident reports created by state and city police officers. Defendants either obtained these reports directly from a local law enforcement office or they subscribed to third-party services that aggregated crash records. There are no allegations that the accident reports are "motor vehicle records" under the DPPA nor that the personal information was obtained from a search of a DMV database.

Plaintiffs argue, nevertheless, that a chain of liability exists from the time information is entered into a DMV database and continues through the issuance of a driver's license and then to any subsequent obtainment, disclosure, or use of information found therein. Such a theory extends the statutory language beyond its explicit construction. It additionally goes against the weight of the case law and the underlying legislative goals identified by the Court in *Maracich*. Indeed, Plaintiffs point to no decision—nor has this Court been able to find one—where a defendant was adjudged liable as a matter of law for a DPPA violation after obtaining, disclosing, or using "personal information" that was not gathered directly from a state DMV.

This Court therefore concludes that Defendants did not violate the DPPA when they obtained, disclosed, or used the information at issue. Defendants' conduct thus falls outside the ambit of the DPPA, and they are entitled to judgment as a matter of law. Finally, though there has been extensive briefing on whether the DPPA violates the First Amendment, this Court expressly declines to address this argument in light of the fact that it reaches its resolution on grounds independent of the constitutional challenge.

B. *UVTA Claim*

Plaintiffs additionally allege that the Andrews-Lanier Defendants violated the UVTA when Defendant Lanier transferred property to Defendant Andrews "without receiving a reasonably equivalent value in exchange" at a time when Defendant Lanier was purportedly "insolvent" to the extent that she did not have the funds necessary to pay Plaintiffs in the event of an adverse judgment on the DPPA claims. (ECF No. 180 ¶ 199.) In light of the above holding finding no violation of the DPPA, the Court additionally grants the Andrews-Lanier Defendants' motion for summary judgment as to Plaintiffs' UVTA claim as well.

For the reasons stated herein, the Court enters the following:

**ORDER**

IT IS THEREFORE ORDERED that Plaintiffs' Motion to Strike the Declaration of Rhonda Harper, (ECF No. 288), is DENIED.

IT IS FURTHER ORDERED that Plaintiff's Motion to Strike the Declaration of Victoria Nourse, (ECF No. 290), is GRANTED IN PART to the extent that the declaration advances an interpretation of a statute or applies expertise to resolve questions of how the law should be applied in the instant case and DENIED IN PART as to the remainder of the document.

IT IS FURTHER ORDERED that Plaintiff's Motion for Summary Judgment, (ECF No. 262), is DENIED.

IT IS FURTHER ORDERED that the Andrews-Lanier Defendants' Motion for Summary Judgment, (ECF No. 264), the Fox Defendants' Motion for Summary Judgment,

(ECF No. 270), and the Womble Defendants' Motion for Summary Judgment, (ECF No. 272) are each GRANTED.

This, the 22nd day of January 2021.

/s/ Loretta C. Biggs
United States District Judge